**JOHNSTON AMBULATORY SURGICAL ASSOCIATES, LTD.**

v.

**Patricia NOLAN, in her capacity as Director of the Rhode Island Department of Health et al.**

**St. Joseph Health Services of Rhode Island, Inc., doing business as St. Joseph Hospital for Specialty Care and Our Lady of Fatima Hospital**

v.

**Patricia Nolan, in her capacity as Director of the Rhode Island Department of Health et al.**

**Nos. 98–512–M.P., 98–493–M.P.**

Supreme Court of Rhode Island.

July 12, 2000.

---

Patricia Rocha, Providence, Randolph Bart Totten, for Plaintiffs.

Joseph G. Miller, Warwick, Peter J. McGinn, Providence, for Defendants.

Present: LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

These consolidated petitions for certiorari sought our review of decisions by two successive Rhode Island Department of Health (department) directors on applications for certificate of need (CON) approval to operate an ambulatory surgical facility. In one of the petitions, the department sought review of that portion of a Superior Court judgment that vacated the department's grant to Johnston Ambulatory Surgical Associates Limited (Johnston Ambulatory) of a CON to establish a freestanding ambulatory surgical center (surgical center) in Johnston, Rhode Island. In the other petition, Johnston Ambulatory sought review of the entire Superior Court judgment, and in particular, that part of the judgment affirming a decision of the department that denied Johnston Ambulatory's prior application for a CON to establish the surgical center. St. Joseph Health Services of Rhode Island, Inc., doing business as St. Joseph Hospital for Specialty Care and Our Lady of Fatima Hospital (St. Joseph), objected to both petitions and asked us to affirm the judgment of the Superior Court. In denying certiorari in both cases, we discuss the doctrine of administrative finality and its applicability here, and we delineate the conditions that must obtain before an applicant may reapply to an administrative agency that has rejected the applicant's previous application.

### Facts and Procedural History

In June 1994, Johnston Ambulatory filed an application for a CON (1994 application) seeking the department's approval to establish in Johnston a surgical center containing three operating rooms, three procedure rooms, and thirteen recovery beds.

A CON must be issued by the department prior to the establishment or expansion of any health care facility in the State of Rhode Island, pursuant to G.L.1956 chapter 15 of title 23 and the regulations promulgated thereunder.[1] On July 15, 1994, in accord with § 23–15–6 and section 10.1 of the regulations, St. Joseph intervened in the 1994 application and made a formal request for public hearings. An administrative adjudication officer held fifteen public hearings to consider the application between July 27, 1994, and October 19, 1994.

After the hearings, a committee of the Health Services Council (council) reviewed the record, compiled a report (the 1994 report), and recommended that the application be approved. On November 28, 1994, the council approved the 1994 report by a vote of eleven to four, with five abstentions. The council's recommendation was forwarded to the then department director, Barbara DeBuono, M.D., (DeBuono). In a twenty-page decision issued on December 3, 1994, DeBuono rejected the council's recommendation and denied Johnston Ambulatory's application. Johnston Ambulatory appealed that decision to a hearing officer, pursuant to section 17 of the regulations. The hearing officer upheld DeBuono's denial of the 1994 application, and on September 29, 1995, Johnston Ambulatory appealed this decision to the Superior Court, pursuant to G.L.1956 § 42–35–15.

While its appeal of the denial of the 1994 application was still pending, Johnston Ambulatory filed a second application for a CON in June 1995 (1995 application). This application was essentially identical to the 1994 application. Again, St. Joseph intervened and requested a formal hearing. Thirteen hearings were held between July 28, 1995, and January 12, 1996. On June 4, 1996, the council voted to issue a report

---

1. During the course of the proceedings before the department and the Superior Court, certain subsections and subdivisions of G.L.1956 chapter 15 of title 23 were renumbered. P.L. 1996, ch. 433, § 1. In addition, the regulations also were renumbered. These changes were not relevant to any material issue before the Court in this case. Accordingly, throughout this opinion we cite the statute and regulations as they currently exist.

recommending approval of the 1995 application by a vote of eleven to one, with five abstentions. On June 14, 1996, the new director of the department, Patricia Nolan, M.D., (Nolan), accepted the council's recommendation and approved the application. St. Joseph appealed Nolan's decision to a hearing officer, who upheld the grant of the CON. On March 19, 1996, St. Joseph appealed the hearing officer's decision in the Superior Court pursuant to § 42–35–15. This appeal was consolidated with Johnston Ambulatory's appeal of the denial of the 1994 application.

Before the trial justice, Johnston Ambulatory claimed that the denial of the 1994 application was error because, it argued, our decision in *Environmental Scientific Corp. v. Durfee*, 621 A.2d 200 (R.I.1993), required DeBuono to give great deference to the recommendation of the council. St. Joseph, on the other hand, asserted that *Environmental Scientific* did not apply to this case because the council acts in an advisory capacity, rather than as an adjudicative fact-finder.

St. Joseph contended that Nolan's approval of the 1995 application was error because that decision did not give deference to DeBuono's decision to reject the 1994 application. In response, the department claimed that the 1994 record was substantially different from the 1995 record and that there was sufficient evidence on the record to support Nolan's grant of the 1995 application.

In a thirty-four-page decision, the trial justice affirmed the denial of the 1994 application and vacated the grant of the 1995 application. With respect to the 1994 application, the trial justice first determined that the director owed no special deference to the recommendations of the council. He then examined DeBuono's written decision and found that it was supported by sufficient competent evidence. On that basis, he denied Johnston Ambulatory's appeal of the decision on the 1994 application. The trial justice then found that the 1995 application was essentially identical to the 1994 application, and that under the doctrine of administrative finality, a subsequent application could be granted only if there had been a substantial change in circumstances since the first application. After examining Nolan's decision to grant the 1995 application, the trial justice determined that there had been no demonstration of a substantial change in circumstances. Accordingly, he determined that the granting of the 1995 application was erroneous, and he vacated that approval.

The department and Johnston Ambulatory each filed petitions for certiorari with this Court seeking review of the judgment of the trial justice, pursuant to § 42–35–16. The writ was issued on Johnston Ambulatory's petition on March 24, 1999, and on the department's petition on May 6, 1999. On November 12, 1999, this Court ordered that the petitions be consolidated for briefing and oral argument.

In their memoranda and argument before this Court, the parties essentially repeated their positions presented in the Superior Court. Johnston Ambulatory contended that DeBuono's decision on the 1994 application was in error because she did not grant sufficient deference to the recommendation of the council, and that Nolan's approval of the 1995 application was appropriate because the doctrine of administrative finality should not be applied to the CON process. St. Joseph took the contrary position on each of these claims. The department argued that DeBuono appropriately denied the 1994 application, but that there was sufficient new evidence at the time of the 1995 application for Nolan to grant approval.

Additional facts will be presented as required for legal analysis of the issues discussed.

## Standard of Review

In reviewing the decision of an administrative agency, the Superior Court is limited to "an examination of the certi-

fied record to determine if there is any legally competent evidence therein to support the agency's decision." *Barrington School Committee v. Rhode Island State Labor Relations Board,* 608 A.2d 1126, 1138 (R.I.1992). In conducting that review, "the Superior Court may not, on questions of fact, substitute its judgment for that of the agency whose action is under review," *Rhode Island Public Telecommunications Authority v. Rhode Island State Labor Relations Board,* 650 A.2d 479, 485 (R.I.1994), even in a case in which the court "might be inclined to view the evidence differently and draw inferences different from those of the agency." *Id.* If there is sufficient competent evidence in the record, the court must uphold the agency's decision. *Barrington School Committee,* 608 A.2d at 1138. The court may, however,

> "reverse, modify, or remand the agency's decision if the decision is violative of constitutional or statutory provisions, is in excess of the statutory authority of the agency, is made upon unlawful procedure, is affected by other errors of law, is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record, or is arbitrary or capricious and is therefore characterized by an abuse of discretion." *Id.* (citing § 42–35–15(g)).

■ When this Court examines the judgment of the Superior Court in administrative proceedings, we are restricted by § 42–35–16 to a review of "any questions of law involved." *Rhode Island Public Telecommunications Authority,* 650 A.2d at 485. We do not weigh the evidence that was before the trial justice, but merely examine the record to determine whether his or her decision was supported by competent evidence. *Barrington School Committee,* 608 A.2d at 1138. When the decision of the trial justice or of the agency is based upon questions of law, as it was in this case, we review those findings *de novo. See, e.g., Nonnenmacher v. City of Warwick,* 722 A.2d 1199, 1202 (R.I.1999)

(the existence of a contract is a question of law reviewed *de novo* by the Court); *Levine v. Bess Eaton Donut Flour Co.,* 705 A.2d 980, 982 (R.I.1998) (statutory interpretation is a question of law that the Court reviews *de novo* ).

### Standing of the Department

■ Before reaching the substantive issues of the case at bar, we must address St. Joseph's claim that the department lacks standing under § 42–35–16 to pursue its petition before this Court. Section 42–35–16 provides that any party in interest may petition this Court for a writ of certiorari "if aggrieved by a final judgment of the [S]uperior * * * [C]ourt." St. Joseph is correct in asserting that the department is not technically "aggrieved," in that the Superior Court judgment does not " 'adversely affect[ ] in a substantial manner some personal or property right of the party or impose[ ] upon it some burden or obligation.' " *Liguori v. Aetna Casualty and Surety Co.,* 119 R.I. 875, 880, 384 A.2d 308, 311 (1978). Nevertheless, we have long recognized an exception to this standard by permitting a public agency or the head of an agency to seek review in this Court " 'if the public has an interest in the issue at stake which reaches out beyond that of the immediate parties' or if the judgment of the lower tribunal would otherwise escape review." *Id.* (citing *Altman v. School Committee,* 115 R.I. 399, 403, 347 A.2d 37, 39 (1975)).

In the present case, the department's decisions on the 1994 and 1995 applications evaluated whether a public need existed for additional outpatient surgical facilities in the state. It is clear that the general public has an interest in such facilities and that such facilities may produce both positive and negative effects on the provision of health care in the state. Therefore, under our case law, the agency responsible for regulating this area clearly has standing to seek review of the judgment of the Superior Court. *See, e.g., Liguori,* 119 R.I. at 880–81, 384 A.2d at 311 (holding

that State Insurance Commissioner had standing to seek review of Superior Court's judgment denying commissioner authority to order insurance reinstated); *Buffi v. Ferri,* 106 R.I. 349, 351, 259 A.2d 847, 849 (1969) (holding that Human Rights Commission had standing to seek review of Superior Court judgment overturning commission's cease and desist order in a housing discrimination case).

## Administrative Deference to Advisory Bodies

 Johnston Ambulatory claimed that DeBuono's rejection of the 1994 application was error because she did not give sufficient deference to the recommendation of the council, as was allegedly required by our decision in *Environmental Scientific,* 621 A.2d at 206–08. In *Environmental Scientific* we examined the process used by the Department of Environmental Management (DEM) to decide administrative appeals of DEM's denials of permits to alter freshwater wetlands. *Id.* at 202–03. That process is set out in G.L.1956 § 42–17.7–6, which directs that an administrative hearing officer shall conduct a hearing, receive evidence, and make written proposed findings of fact and proposed conclusions of law. These findings and conclusions are then submitted to the director of DEM for review, and the director is authorized to reject or modify these proposed findings as long as such modification or rejection is in writing and states the rationale for the modification or rejection. In *Environmental Scientific,* this Court held that in this two-tiered process, the director of DEM was required to give deference to the hearing officer's findings that relied upon determinations of witness credibility. *Id.* at 206. However, if the findings of the hearing officer did not rely upon determinations of credibility, the director of DEM was authorized to review those findings *de novo. Id.* at 206–07. Thus, in order for this Court to agree with Johnston Ambulatory that *Environmental*

*Scientific* is controlling in the case at bar, we would first have to conclude that the CON statute calls for a two-tiered decision-making process, and we would then have to hold that the recommendation of the council was based primarily on a determination of witness credibility. It is our determination that neither of these conditions obtained, and therefore DeBuono did not owe any special deference to the recommendation of the council when she rejected the 1994 application.

It is true that there are similarities between the appellate review by the DEM in *Environmental Scientific* and the decision-making process of the department in the present case. In each instance there is an individual (the hearing officer in the case of DEM) or group (the council in the case of the department) that reviews the evidence presented and makes a recommendation to the department director. In each procedure, the ultimate decision-maker (the director) is authorized to reject or modify the recommendation in writing, and such a rejection or modification can be made only upon presentation of a rationale for the change. Despite this apparent congruity, the departments' procedures easily can be distinguished. First, the Legislature has stated explicitly that in proceedings to consider an application for a CON, the council is to act as an "advisory body," § 23–15–7, and that its role is solely "to consult and advise" the department. Section 23–17–14(3). In contrast, in the DEM's administrative review scheme, the hearing officer conducts "adjudicatory proceedings," § 42–17.7–2, and is clearly charged with a quasi-judicial role. Section 42–17.7–6. Further, the hearing officer in the DEM scheme conducts the hearings and necessarily directly observes all the testimony and evidence presented. Section 42–17.7–6. In respect to the CON process, the council does not conduct the hearings and is not required to be present at them.[2] CON Regulations, sec. 10. Of

---

**2.** Section 10.3(b) of the CON regulations does provide that a hearing officer shall conduct

the four hearings on the 1994 application for which attendance was noted in the record, no more than six of the twenty-two council members attended at least part of the hearing. In making its recommendation to approve the 1994 application, the council was not relying on first-hand observation of the evidence and testimony, but instead was relying on the same "cold record" reviewed by DeBuono when she decided to reject the application. The council in this case simply did not have the same role as that of the DEM hearing officer in *Environmental Scientific,* and the deferential standard articulated in that case is not applicable to the case before us.

Even if this Court were to hold that the decision-making process in this case was the same type of two-tiered process that was at issue in *Environmental Scientific,* DeBuono would have owed no special deference to the council's recommendation to approve the 1994 application. As we noted in *Environmental Scientific,* in a two-tiered administrative process, the ultimate decision-maker owes deference to the recommendations of the first-tier decision-maker only if those recommendations were based on determinations of witness credibility. 621 A.2d at 206. If the recommendations were not based on credibility determinations, the ultimate decision-maker may review the recommendations on a *de novo* basis. *Id.* at 206–07. Our careful review of the council's recommendation to approve the 1994 application revealed not a single finding that relied on the credibility of any witness. Neither was there any indication that the credibility of witnesses, or lack thereof, contributed in any way to the council's recommendation that the 1994 application be approved. Hence, even under the rule of *Environmental Scientific,* DeBuono was permitted to review the council's recommendation *de novo.*

The only limitation on DeBuono's review of the council's recommendation is provid-

the hearings, but this hearing officer acts only in a ministerial capacity and is not involved in the council's determination of its recommen-

ed by the statute, which states that "[i]f the state agency proposes to render a decision which is contrary to the recommendation of the health services council, the state agency must render its reasons for doing so in writing." Section 23–15–4(f)(3)(ii). When DeBuono rejected the 1994 report of the council, she did so in a twenty-page written opinion that thoroughly presented the rationale behind her rejection of the council's recommendation. Therefore, her decision to deny the 1994 application was not error.

### Administrative Finality

The main point of contention regarding the decision to grant the 1995 application was whether Nolan was bound in any way by the outcome or reasoning of DeBuono's decision to reject the 1994 application. The trial justice found that the doctrine of administrative finality should be applied, that the decision to grant the 1995 application did not comply with this doctrine, and, therefore, that Nolan's decision on the 1995 application was precluded by DeBuono's decision on the 1994 application. Ultimately, as we shall discuss below, we agree with this conclusion. However, because several distinct doctrines were conflated in argument before this Court, and because our terminology on the subject differs from that used in other jurisdictions, we shall briefly discuss the general rules that govern the deference that an administrative agency owes to earlier decisions.

There are three judicial doctrines that require courts to give varying degrees of deference to earlier judicial decisions. The doctrine of *stare decisis* dictates that courts should adopt the reasoning of earlier judicial decisions if the same points arise again in litigation. This principle is not absolute, however, and courts may abandon previously adopted rules of law under the right circumstances. *See*

dation or the director's review of the council's recommendation.

*State v. Werner*, 615 A.2d 1010, 1014 (R.I. 1992) (holding that "overruling precedent is justified if the motivating purpose is to eliminate inconsistency and anomalous results"). Collateral estoppel is a more rigid doctrine, in that it "bars litigation of an issue when that issue has been determined by a valid and final judgment." *DeCiantis v. State*, 666 A.2d 410, 412 (R.I.1995). The doctrine of *res adjudicata* has an even greater preclusive effect, in that "it makes a prior judgment in a civil action between the same parties conclusive with regard to any issues that were litigated in the prior action, or, that could have been presented and litigated therein." *ElGabri v. Lekas*, 681 A.2d 271, 275 (R.I.1996). Thus, "[a] party defeated in one action cannot maintain a second action based on a ground which could properly have been, but was not, set forth and relied upon in the former action." *Id.* (quoting *Wholey v. Columbian National Life Insurance Co.*, 69 R.I. 254, 262, 32 A.2d 791, 795 (1943)). Because the actions of administrative agencies are frequently quasi-judicial in nature, courts have found it useful to apply each of these judicial doctrines to administrative agencies. *See, e.g., Astoria Federal Savings & Loan Association v. Solimino*, 501 U.S. 104, 107–08, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96, 104 (1991) (discussing application of collateral estoppel and *res adjudicata* to decisions of administrative agencies); *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 807–08, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350, 362 (1973) (applying *stare decisis* to decisions of Interstate Commerce Commission); *Department of Corrections of State of Rhode Island v. Tucker*, 657 A.2d 546, 549 (R.I.1995) (holding that *res adjudicata* should be applied to decisions of quasi-judicial administrative tribunals).

■■■■■■ In addition to these judicial doctrines, Rhode Island and at least one other jurisdiction have promulgated a doctrine of administrative finality. *Day v. Zoning Board of Review of Cranston*, 92

R.I. 136, 140, 167 A.2d 136, 139 (1961). *See also Florida Power & Light Co. v. Beard*, 626 So.2d 660, 662 (Fla.1993) (applying administrative finality to Florida's Public Service Commission). Under this doctrine, when an administrative agency receives an application for relief and denies it, a subsequent application for the same relief may not be granted absent a showing of a change in material circumstances during the time between the two applications. *Audette v. Coletti*, 539 A.2d 520, 521–22 (R.I.1988). This rule applies as long as the outcome sought in each application is substantially similar, *May–Day Realty Corp. v. Board of Appeals of Pawtucket*, 107 R.I. 235, 237, 267 A.2d 400, 401–02 (1970), even if the two applications each rely on different legal theories. *Costa v. Gagnon*, 455 A.2d 310, 313 (R.I.1983). Administrative action is not final, however, if the first decision was invalid. *Hester v. Timothy*, 108 R.I. 376, 384, 275 A.2d 637, 641 (1971) (declining to apply administrative finality when the first application was denied on a vote for which only four members of the zoning board were present, in violation of a statute requiring all five to be present).

■■■■ It is clear that neither collateral estoppel nor *stare decisis* were at issue in the case at bar. The parties, however, disputed whether *res adjudicata* or whether administrative finality should apply. Moreover, the trial justice and the parties used these latter terms interchangeably, as though they had the same meaning. Although related, the two doctrines are distinct. They are related in that each one acts to partially or wholly preclude an administrative agency from revisiting an earlier decision. But, despite this similarity, there is an important difference between them. *Res adjudicata* functions as an *absolute* bar to a second cause of action on any matters that were actually raised or that could have been raised in the first proceeding. *See Tucker*, 657 A.2d at 549 (holding that a former employee was absolutely barred from pursuing any claim be-

fore the Commission for Human Rights that was raised or that could have been raised in his prior claim before the Personnel Appeal Board). Administrative finality, on the other hand, provides for a qualified and limited preclusion, wherein a second application for substantially similar outcome from an administrative agency is barred unless the applicant can demonstrate a change in material circumstances between the two applications.

Johnston Ambulatory and the department essentially contended that an application of the doctrine of *res adjudicata* to the CON process would be too restrictive because it would prevent the department, having once denied Johnston Ambulatory's application to open the center in Johnston, from ever again considering another application, regardless of a subsequent critical public need or substantially changed circumstances. We agree that strict application of *res adjudicata* would have such a preclusive effect. Application of administrative finality, however, would not have such an effect on the administrative agency, because Johnston Ambulatory would be permitted to submit a subsequent application provided the application demonstrated a material change in circumstances from those that obtained at the time of the prior application.

Because most jurisdictions do not apply a rule of administrative finality,[3] the only principle precluding repetitive claims for administrative relief in those jurisdictions is *res adjudicata*. In determining whether to apply *res adjudicata* to administrative proceedings, courts have responded in two ways, neither of which is satisfactory to us.

Some courts, reacting to the strict preclusion that *res adjudicata* requires, have declined to apply the doctrine in at least some types of administrative proceedings by determining, for example, that when the administrative agency is making a determination of public convenience or necessity, *res adjudicata* does not apply. *See Northern National Bank v. Banking Board,* 37 Colo.App. 135, 547 P.2d 253, 255 (1975) (holding that *res adjudicata* does not apply to decision to deny bank charter where agency is required to consider "public need and advantage"); *Empire Electric Association, Inc. v. Public Service Commission,* 604 P.2d 930, 933 (Utah 1979) (declining to apply *res adjudicata* to issuance of certificates of convenience and necessity for public utilities). *See also Panhandle Eastern Pipe Line Co. v. Federal Power Commission,* 236 F.2d 289, 292 (3d Cir.1956) ("the doctrine of res [ad]judicata can have no application to a proceeding * * * which involves a determination of the present or future public convenience or necessity with respect to the continuance or abandonment of natural gas service"). This approach is problematic, however, because it provides no clear-cut preclusive principle by which an administrative agency should reassess a formerly rejected application. Applying the public convenience or necessity exception to *res adjudicata* could result in arbitrary and capricious decision-making by administrative agencies or perhaps to outcomes driven by subjective considerations.

Other jurisdictions have applied *res adjudicata* in a qualified form that permits an agency to revisit a former decision if

---

**3.** Other jurisdictions have used the term "administrative finality" but have imbued it with different meanings. For example, in New York it is an aspect of the ripeness doctrine, wherein the decision of a quasi-judicial body must achieve administrative finality before it may be reviewed by a court. *Daniel v. New York State Division of Housing and Community Renewal,* 179 Misc.2d 452, 683 N.Y.S.2d 404, 409 (N.Y.Sup.Ct.1998). In Colorado, administrative finality marks the point at which an administrative action is complete, so that a claim for judicial relief accrues and the statute of limitations begins to run. *Wilson v. Board of County Commissioners of Weld County,* 992 P.2d 668, 670 (Colo.Ct.App.1999). In Pennsylvania, it is related to waiver, such that an aggrieved party that does not appeal the action of an administrative agency is barred by administrative finality from later contesting that action. *Department of Environmental Protection v. City of Philadelphia,* 692 A.2d 598, 604 (Pa.Commw.Ct.1997).

there has been a change in circumstances. *See Rhema Christian Center v. District of Columbia Board of Zoning Adjustment,* 515 A.2d 189, 193 (D.C.App.1986) (holding that if the applicant can show changed circumstances, *res adjudicata* will not bar second application); *Pequinot v. Allen County Board of Zoning Appeals,* 446 N.E.2d 1021, 1027 (Ind.Ct.App.1983) (holding that the doctrine of "administrative res judicata" requires an applicant to demonstrate changed circumstances). This approach provides agencies and courts with a rule governing the preclusive effect that a prior administrative decision must be given, but it is still problematic because it could lead to confusion in deciding in which circumstances administrative agencies are subject to strict *res adjudicata* and when they must comply with the more limited form. As we stated in *Tucker,* in Rhode Island the preclusive effect of *res adjudicata* should apply to those decisions rendered when an administrative agency has acted in a quasi-judicial capacity. *Tucker,* 657 A.2d at 549.

It is our conclusion that the Rhode Island doctrine of administrative finality navigates safely between these obstacles. It prevents repetitive duplicative applications for the same relief, thereby conserving the resources of the administrative agency and of interested third parties that may intervene. *See Palazzolo v. State,* 746 A.2d 707, 710–11 (R.I.2000), *petition for cert. filed* (U.S. June 21, 2000) (No. 99–2047) (the owner of a parcel of land filed numerous nearly identical applications for the same relief over a twenty-three-year period). Administrative finality also limits arbitrary and capricious administrative decision-making, while still preserving the ability of an agency to revisit earlier decisions when circumstances have changed. Finally, by requiring decision-makers to articulate the changed circumstances that support a different decision on a subsequent application, administrative finality provides for effective judicial review of these decisions.

■ Johnston Ambulatory and the dissent each asserted that the doctrine of administrative finality should not be applied to successive applications for a CON. It is true that in the past we have had occasion to invoke the doctrine only in cases involving land-use regulation. However, there is nothing in our case law that would restrict the doctrine to that field. Further, it is our opinion that there is no inherent reason that the rule should not be generally applicable to most areas of administrative regulation. The purpose of the doctrine is to promote consistency in administrative decision-making, such that if the circumstances underlying the original decision have not changed, the decision will not be revisited in a later application. This is clearly as worthwhile a goal in the CON context as it is in the zoning context. Johnston Ambulatory's allegation that circumstances change much more quickly in the area of health services than they do in the area of land use is most likely correct. But such a conclusion does not render it inappropriate to apply administrative finality to decisions on whether there is need for additional health services. Rather, given the current fluid context of health services, the burden imposed by administrative finality is light, requiring only that an applicant demonstrate and identify circumstances that have materially changed since a previously rejected application.

The dissent argues that it is particularly inappropriate to apply administrative finality to the CON process because the statute "implicitly endorses the filing of successive applications during subsequent review periods. Only when an applicant seeks reconsideration of a previously filed application must it satisfy certain statutory requirements warranting such reconsideration." We agree with the dissent that an applicant is permitted to file successive applications during subsequent review periods, as long as those applications satisfy the requirements of administrative finality by identifying changed circumstances. As the dissent points out, § 23–15–6(b)(9)

permits an applicant to seek reconsideration of a rejected application in the same review period. But the statute imposes restrictions on that reconsideration that are clearly intended to prevent the agency from reconsidering a rejected application in an arbitrary or capricious manner. For instance, an applicant may seek reconsideration of a rejected application if the applicant can demonstrate "that there have been significant changes in factors or circumstances relied upon by the state agency in reaching its decision." Section 23–15–6(b)(9)(ii). The dissent's basic position amounts to an argument that the Legislature bars the agency from arbitrarily reconsidering an application in one review period but permits the agency to arbitrarily reconsider the same application in a second review period, a position with which we do not agree.

In our view, applying administrative finality to the CON process will not have a chilling effect on the provision of new health care services in Rhode Island, as the dissent has argued. We do agree that it would be unwise to severely limit the ability of health care providers to offer new services to the people of the state. However, it is our belief that the application of administrative finality has no such preclusive effect. There is nothing in our decision that would prevent Johnston Ambulatory from immediately filing a new application for a CON, if the application demonstrates a change in material circumstances since the time of the rejection of the previous application. Similarly, the department is not precluded from issuing a decision that contradicts an earlier decision to reject a CON application, provided that decision includes a finding of fact that circumstances had changed and points to specific evidence to support that finding.

■ This minor burden on the applicant and on the agency can be contrasted with the effect upon other affected parties if administrative finality were not applied to the CON process. Under the theory advanced by Johnston Ambulatory, third parties such as St. Joseph that could be materially affected by a grant of a CON would not be able to rely on a decision to deny a CON, but constantly would be faced with the prospect that the department would revisit that decision at any time, regardless of a lack of any material change in circumstances. We therefore hold that the doctrine of administrative finality should be applied to the CON process.

■ As we have noted, the doctrine of administrative finality requires that when an administrative agency receives an application and denies it, the same subsequent application may not be granted absent a showing of a material or substantial change in circumstances in the time intervening between the two applications. *Audette*, 539 A.2d at 521–22. This rule places a burden on the applicant to identify the substantial changes since the prior application. What constitutes a material change will depend on the context of the particular administrative scheme and the relief sought by the applicant and should be determined with reference to the statutes, regulations, and case law that govern the specific field. The changed circumstances could be internal to the application, as when an applicant seeks the same relief but makes important changes in the application to address the concerns expressed in the denial of its earlier application. Or, external circumstances could have changed, as when an applicant for a zoning exception demonstrates that the essential nature of land use in the immediate vicinity has changed since the previous application. Finally, there is a burden on the administrative decision-maker to articulate in its decision the specific materially changed circumstances that warrant reversal of an earlier denial of the relief sought.

■ Having set forth the parameters, we examine the application of the doctrine of administrative finality to the 1995 application. There can be no dispute that the 1994 and 1995 applications requested iden-

tical relief, in that each sought a CON for the operation of a surgical center containing three operating rooms, three procedure rooms, and thirteen recovery beds. The trial justice thoroughly reviewed the two applications and concluded that "there is very little difference between their respective contents [,and] [t]he differences that do exist do not reflect any substantial or material change in circumstances." The trial justice cogently presented the minor differences between the two applications. We believe that there is sufficient evidence to support his finding that these differences were neither substantial nor material. Hence, there was no internal change in circumstances between the 1994 and 1995 applications. In the 1995 application, Johnston Ambulatory did not explicitly discuss any material change in the external circumstances that obtained at the time of the earlier application.[4] On its face, therefore, the 1995 application did not meet the burden imposed by the doctrine of administrative finality.

Nolan's decision on the 1995 application also did not meet the facial burden of administrative finality, which requires the administrative decision-maker to articulate the changed circumstances that warrant a reversal of the prior decision. Nolan's two-page decision made no mention whatsoever of the 1994 application. The council's report, which was incorporated into Nolan's decision, specifically stated that the 1994 application was irrelevant to consideration of the 1995 application. Thus,

Nolan's decision was inadequate because it contained no finding in respect to any changed circumstances warranting reversal of DeBuono's decision on the 1994 application.

 Johnston Ambulatory and the department argued that new evidence was presented during the hearings on the 1995 application and that this evidence demonstrated that circumstances relevant to the statutory criteria of need and affordability had changed since the time of the 1994 application.[5] Were we to examine the evidence and draw conclusions therefrom, we might conclude that circumstances had changed sufficiently to warrant a reversal of the decision on the 1994 application. However, it is not the role of this Court, nor is it the role of the trial justice, to engage in such an analysis. Rather, our review is limited to a determination of whether there was sufficient competent evidence to support the findings made by the administrative agency. *Barrington School Committee*, 608 A.2d at 1138. The determination of whether circumstances have materially or substantially changed sufficiently to warrant reversal of an earlier decision is a finding that must be made in the first instance by the administrative decision-maker and not by this Court. Because Nolan made no findings in respect to a material change in circumstances between the two applications, we shall not delve into the record to determine whether such changes were present.[6] Consequent-

4. The trial justice found that there was one difference in the circumstances alleged between the 1994 and 1995 applications. In the 1995 application, Johnston Ambulatory contended that a different surgical center was performing fewer procedures than it had performed at the time of Johnston Ambulatory's 1994 application because that surgical center was conducting more complex, time-consuming procedures by 1995. We agree with the trial justice that this was not a material or substantial change in circumstances.

5. In particular, Johnston Ambulatory and the department pointed to different projections about the utilization of surgical facilities in the state, evidence of the volume of outpatient

surgery performed at other surgical centers, and evidence that Johnston Ambulatory would be reimbursed by insurers and other payors at a lower rate than St. Joseph for the same procedures.

6. The dissent has suggested that we remand the case to the department to permit the administrative decision-maker an opportunity to make the findings of fact that were not previously made. In that case the department would be constrained to decide in the year 2000 whether 1995 data supported the issuance of a CON, clearly incompatible with the dissent's concern, which we share, that such "health-policy considerations" must be made in a "time-sensitive" manner. As we have

ly, we affirm the trial justice's finding that Nolan's approval of the 1995 application violated the doctrine of administrative finality.

The dissent argues that our decision in this case invites a trial justice to weigh the evidence and reach his or her own conclusion about whether there was a change in material circumstances that would warrant granting a CON that had earlier been denied. We agree that if the department has made a finding of fact that there had been a material change in circumstances and pointed to evidence to support that finding, a trial justice would likely abuse his or her discretion by independently reviewing the evidence and rejecting the department's finding. When the department has not made such a required finding, as in this case, it cannot be said that the trial justice has substituted his or her judgment for that of the administrative decision-maker.

Finally, we must deal with a procedural matter. Johnston Ambulatory alleged that the trial justice raised the issue of administrative finality *sua sponte.* Although the argument was not presented directly to us, it could be claimed that because no party raised administrative finality in the Superior Court, it was not properly before us. In its brief and in oral argument, St. Joseph contended that it did not raise the argument before the trial justice because DeBuono's denial of the 1994 application could not have preclusive effect until it was made final. Because the denial of the 1994 application was being appealed in the Superior Court, that denial could not be said to be final until that appeal was finally decided. It is true that *res adjudicata* gives preclusive effect only to a final judgment and that an attempt to raise the issue before entry of such judgment is generally not ripe. Administrative

finality, however, does not face such a limit. Rather, the burden is on the applicant to demonstrate a change in material circumstances at the time of the second application, regardless of whether the first application is being appealed.[7] Because neither the trial justice nor the parties addressed these distinctions, it was not error for St. Joseph to refrain from making an administrative finality argument in the mistaken belief that such an argument was not ripe. In any case, an examination of the administrative appeal complaint filed by St. Joseph in the Superior Court revealed that while St. Joseph did not use the terms administrative finality or *res adjudicata,* the only contention in the complaint was that Nolan's decision did not give proper preclusive effect to DeBuono's earlier decision. Therefore, the substance of the argument relied upon by the trial justice was raised before him and could be considered by this Court.

### Conclusion

We conclude, therefore, that the trial justice correctly determined that DeBuono did not owe any special deference to the recommendation of the council and therefore that her decision to deny the 1994 application was not error. The trial justice also correctly applied the doctrine of administrative finality to determine that Nolan's decision to grant the 1995 application was error. The petitions for certiorari are hereby denied and dismissed. The writs heretofore issued are quashed, and the papers in the case may be remanded to the Superior Court.

Chief Justice WEISBERGER did not participate.

FLANDERS, Justice, concurring in part dissenting in part

Although I agree with that portion of the Court's opinion holding that the De-

already noted, Johnston Ambulatory is free to reapply for a CON. If such reapplication is made, the department will be able to make a decision based on the most current information.

7. If the appeal of the first application is successful, and the relief sought is granted by order of a court, the second application is moot and administrative finality no longer is an issue.

partment of Health (department) has standing to seek review of the Superior Court's judgment, I respectfully dissent with respect to its application of the doctrine of administrative finality in this case. Even assuming, without deciding, that the department's director owed no special deference to the recommendations of the Health Services Council (council), I do not believe that the doctrine of administrative finality should apply to this type of administrative proceeding, which depends so heavily on a showing of "demonstrated need *at the time and place and under the circumstances proposed * * *.*" G.L.1956 § 23–15–4(f)(1). (Emphasis added.) Because of volatile conditions in the rapidly evolving market for health-care services, the very same new health-services proposal that fails to win approval at one time and place for lack of need, may succeed at a later time and place, based upon conditions external to the application itself. These would include changes in the relative need for the proposed health-care project as shown by the variable market conditions prevailing when the later application is considered, as well as how the then-incumbent health-care authorities assess the proposal in light of such need.

Here, the certificate-of-need (CON) enabling legislation requires that time-sensitive, health-care policy considerations, rather than legalistic doctrines like collateral estoppel and res judicata, should control whether applications like this one merit approval. The CON enabling legislation contains no restrictions on the successive filing and approval of applications in subsequent review cycles after the department's director has denied an initial request for approval. Indeed, the legislation at issue implicitly *allows* such subsequent applications to be resubmitted without the necessity of demonstrating any material change in circumstances because it requires the state agency to undertake a review of pending applications "no less often than twice a year," § 23–15–6(b)(1), and requires written notification to the applicant of the agency's final decision within 120 days after notifying those affected about the application. *See* § 23–15–6(b)(2). The enabling act thereby implicitly endorses the filing of successive applications during subsequent review periods. Only when an applicant seeks reconsideration of a previously filed application must it satisfy certain statutory requirements warranting such reconsideration. *See* § 23–15–6(b)(9)(i)–(iv). But reconsideration is a different matter than a refiling of the application during a later review period or a filing of a new application altogether: the first does not require the entire application to be refiled, and it avoids the paperwork, costs, hearings, and other procedural requirements that a refiled or new application must meet. Most significantly, only reconsiderations, not refilings or new filings, are subject to satisfying the change factors detailed in § 23–15–6(b)(9) (for example, showing "significant changes in factors or circumstances relied upon by the state agency in reaching its decision," *id.* at § 23–15–6(b)(9)(ii)).

Thus, the judicial imposition of an administrative-finality requirement on successive applications imposes a legalistic construct on the CON process that draws no support from the legislation that created it. And because of the chilling effect that such a finality requirement imposes on innovative health-care initiatives, I believe that it is an ill wind that blows, one that stunts economic growth, stifles entrepreneurial creativity, and stultifies competition in an otherwise dynamic and rapidly changing health-care market.

It also disinters the dead hand of a long-since-departed director of the department, one whose policy views were rejected not only by the council that initially recommended the proposed JASA surgical center, but also by the present council and director, both of whom have concluded that this project is both needed and affordable, and, therefore, should be approved. Thus, the majority of the Court allows the

parting blow of an absconding health-care director to kill this proposal again, long after her repudiated policy should have been dead and buried.

Moreover, even if (contrary to § 23–15–6) the enabling legislation in question *had* required subsequent CON applications to evince significant changes in the facts or circumstances that existed when the original application was denied, this application and the relevant administrative record show that such significant changes did exist. Although Johnston Ambulatory Surgical Associates Limited's (JASA) 1994 and 1995 CON applications prayed for the same relief, the 1995 application contained additional material demonstrating the existence of public need. For instance, the 1995 Zimmerman update supported the need for nine additional outpatient operating rooms during the period 1996 through 1999. In its 1996 report, the health-services council found this estimate to be "conservative at best." Consistent with this finding, JASA's 1995 application also demonstrated that other outpatient surgical care centers were performing procedures more often and of a more complicated nature in 1995 than previously had been expected. Thus, the council concluded—and the director incorporated this conclusion by reference—that "[t]he competent testimony in the record demonstrates the need for the outpatient surgery setting proposed by JASA. * * * Where JASA and St. Joseph's [*sic*] differ, is on JASA's ability to provide the outpatient surgery in an innovative setting where the surgery is conducted more efficiently, benefiting the patient and the doctor, and on a more cost effective basis." The trial justice acknowledged these changed circumstances, but concluded that the differences did not "reflect any substantial or material change in circumstances." This conclusion, however, reflects an inappropriate weighing of this evidence by the trial justice that violated the applicable G.L.1956 § 42–35–15(g)

standard of review, forbidding the court from "substitut[ing] its judgment for that of the agency as to the weight of the evidence on questions of fact."

Instead of searching the administrative record for any evidence of material changed circumstances since the former director denied the original application, the reviewing trial justice, on his own initiative and without any request to do so from any party (including the objecting hospital), determined that he should apply the doctrine of administrative finality to overturn the judgment of this state's present health-care policymakers and find that the proposed surgical center was a project unworthy of their approval. But when the trial justice concluded that these changes in JASA's 1995 application were not substantial enough to warrant a reversal of the previous director's denial of the earlier request, he substituted his judgment for that of the current health-care officials who found otherwise and who then approved the application. In my judgment, he had no business or legal warrant to do so.

The majority concedes that, if it ever were "to examine the evidence and draw conclusions therefrom, we might conclude that circumstances have changed sufficiently to warrant a reversal of the decision on the 1994 application." It then asserts, however, that "it is not the role of this Court, nor is it the role of the trial justice, to engage in such an analysis,"[8] but only to determine "whether there was sufficient competent evidence to support the findings made by the administrative agency." Although neither the department's director (Nolan) nor the council made any such explicit finding of changed circumstances vis-à-vis the 1994 application, they did find that JASA had established the requisite need for its 1995 proposal. And because neither the enabling statute nor any prior ruling of this Court had alerted the department that it was

---

8. Note that the trial justice did engage in such an analysis, substituting his judgment for the

Department of Health concerning the significance of these changed circumstances.

required to make such a changed-circumstances finding, I find it hard to fault them for this omission. Thus, instead of seizing on the technicality that Director Nolan's decision was "inadequate because it contained no finding in respect to any changed circumstances warranting reversal of DeBuono's decision on the 1994 application," I would, as an alternative to reversing the trial justice, direct the Superior Court to remand this case to the department to give it the opportunity to make such a finding.

As this Court stated in *Lemoine v. Department of Mental Health, Retardation and Hospitals*, 113 R.I. 285, 320 A.2d 611 (1974), a remand is

"intended as a safety valve, permitting the reviewing court to require a second look at situations and conditions which might not warrant a reversal, but which, to the court reviewing the record, would indicate to it that the * * * [agency] may have acted on incomplete or inadequate information; or may have failed to give adequate consideration to an alternative route * * *.

"A remand for further consideration is not a determination that the [agency] is wrong; but it is an indication that the disinterested court, which has reviewed the record, is not satisfied on the basis of that record that the [agency] is right." *Id.* at 291–92, 320 A.2d at 615 (quoting *State ex rel. Gunstone v. State Highway Comm'n*, 72 Wash.2d 673, 434 P.2d 734, 735 (1967)).

Given that the record contains evidence from which even the majority "might conclude that circumstances have changed sufficiently to warrant a reversal of the decision on the 1994 application," the Court is simply elevating form over substance in refusing to direct the Superior Court to remand this case to the present director of the department so she can have the opportunity to make what the Court now says is the requisite finding based upon these changed circumstances. Such a remand is especially appropriate when this Court is announcing a new rule of law

that is not apparent on the face of the statute, that pertains to an issue that no person or party raised before the agency or the reviewing court, and that is contrary to the historical practice of the agency in question. *Cf. Taglianetti v. Fontaine*, 105 R.I. 596, 601, 253 A.2d 609, 612 (1969) (stating, in a bail-proceeding context, that "[p]rior to our decision [in that case], the rules governing a proceeding of [that] type were uncertain" and "[f]or [that] reason, [the Court] remand[ed] th[e] cause to the superior court * * *"). Other jurisdictions also prefer to remand cases upon similar circumstances. *See, e.g., V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539, 555 (2000) (stating that "[o]rdinarily, when [the New Jersey Supreme Court] announces a new standard, [it] remand[s] the case to the trial court for reconsideration").

I also respectfully suggest, however, that there is a good reason why the vast majority of other jurisdictions in states throughout this country have no administrative-finality doctrine similar to the one the majority applies to the applicant in this case. Such a rule, as applied to administrative policymaking under this type of a need-based enabling statute, is bad law, bad policy, and, taken to its extreme, wrongly imposes an overly legalistic and technocratic regime on administrative policymaking in the protean field of new health-care services without any legislative warrant to do so.

Other jurisdictions have warned against exactly this kind of "too doctrinaire" application of this rule, since the actions of administrative agencies, unlike those of courts, usually involve "deciding issues according to a public interest that often changes with shifting circumstances and passage of time." *McCaw Communications of Florida, Inc. v. Clark*, 679 So.2d 1177, 1179 (Fla.1996). For this reason, the doctrine of administrative finality should not necessarily preclude an agency from revisiting an earlier order. *See id.*

As the majority admits, the Rhode Island cases it cites to support its application of the doctrine of administrative finality involve adjudication of land-use matters— such as appeals of zoning board decisions or environmental agency matters (*Palazzolo v. State*, 746 A.2d 707 (R.I.2000), *petition for cert. filed* (U.S. June 21, 2000) (No. 99–2047); *Audette v. Coletti*, 539 A.2d 520 (R.I.1988))—areas in which the majority's application of administrative finality arguably makes more sense than it does here. The adjudication of land-use disputes requires a greater need for stability and predictability than need-based policy decisions in the dynamic health-care market of today. The majority also cites *Department of Corrections of the State of Rhode Island v. Tucker*, 657 A.2d 546, 548 (R.I.1995), which concerned an appeal by a corrections officer of a decision of the Personnel Appeal Board of the state to the Rhode Island Commission for Human Rights. *Tucker*, however, did not involve an appeal to the same body that made the original decision, as is the case here. *Tucker* merely stands for the proposition that claim preclusion should occur when an adjudicative decision of one administrative agency is appealed, after a decision, to a different agency. Thus, it has no application to the kind of administrative policy decisions that are at issue here.

In § 42–35–15(g), the Legislature intended for the reviewing court to defer to the expertise of the administrative agency on questions of fact because the director and the council are in a better position than the trial justice to know and understand the factors affecting the public's need for health-service proposals and, thus, to judge the credibility, weight, and materiality of JASA's additional evidence presented in support of its 1995 application. Whether a public need exists for this particular surgical-care center is primarily a question of fact and of health-care policy and, therefore, it fell squarely within the purview of the department. Director Nolan specifically found that the 1995 application contained sufficient evidence of public

need to approve the CON. Even though the trial justice reviewed the record and acknowledged the changes regarding the evidence of public need, he determined that they were not substantial enough to justify a change in the agency's 1994 decision. But his obvious weighing of this evidence ignored the deferential "any competent evidence" standard of review that the court should have applied. Thus, in my judgment, the trial justice committed reversible error when he substituted his judgment for the agency on this issue.

In *Capaldo v. Public Utility Hearing Board*, 77 R.I. 378, 383, 75 A.2d 302, 305 (1950), we held that the Public Utility Hearing Board could not preclude a redetermination of public need if the evidence presented demonstrated the existence of public need at a later time. In this case, by applying the doctrine of administrative finality to this agency's initial denial of an application that may have been premature or ahead of its time when it was first denied, the majority's decision forecloses the department's reassessment of public need for proposals like this one that may not be ripe for approval when they are first considered and denied but become so later as more data establish the existence of need. In my judgment, however, it is a mistake to apply administrative finality to policy decisions like this one that are based on a time-specific and place-sensitive assessments of public need.

The virtue of administrative finality is to conserve agency, intervenor, and judicial resources from being wasted on repetitive hearings of the same evidence on the same issues. But a redetermination of the public's need for a proposed health-care services project does not undermine this worthy goal because the need for these services is subject to rapid change and the hearings on any refiled application can be confined and limited to whatever evidence of need is new or different from that previously submitted. The CON statute also allows for such redeterminations by not

precluding successive applications in later review periods. Moreover, the department's unfettered ability to reevaluate the public's health-care needs vis-à-vis a specific proposal "at the time and place and under the circumstances proposed" is critical to the health and well-being of Rhode Island citizens. If the benefits of the administrative-finality doctrine needed to be balanced against the assurance of adequate health-care resources for our community, the Legislature has come down squarely in favor of the latter. Thus, judicially force-feeding the doctrine of administrative finality into Rhode Island's health care system will prove a bitter pill for the public to swallow. Instead of encouraging applicants to present their innovative health-services proposals for certification as soon as they become available, administrative finality will tend to dissuade them from doing so because they may, as a practical matter, get only one shot at approval. And if they fail to win the director's approval upon his or her initial review, they may thereafter fail forever, because no matter how much market conditions and the need for such a proposal may change over time, some reviewing trial justice may think that these changes are not as significant as the state's health-care policymakers say they are, thereby dooming such proposals to perpetual rejection because of administrative finality.

Accordingly, I would reverse the trial justice's *sua-sponte* decision to apply administrative finality to this situation because the court erred in substituting its judgment for that of the state's current health-care administrators concerning whether JASA's application was needed as a matter of health-care policy. Alternatively, I would vacate the Superior Court's judgment and direct that it remand this case to the department so that it can analyze and determine whether JASA's 1995 application established changed circumstances sufficient to warrant reversal of

Director DeBuono's decision denying its 1994 application.

Chief Justice WEISBERGER did not participate.