DECISION
Before this Court is the appeal of Gerard W. Southland (Southland) from a decision of the Personnel Appeal Board (Board). The Board affirmed the termination of Southland from his position as Senior Janitor at the University of Rhode Island. Jurisdiction is pursuant to G.L. 1956 § 45-35-15.
 FACTS AND TRAVEL
For twenty two years, Southland was an employee of the University of Rhode Island (URI). During the time pertinent to this appeal — 1993 through 1994 — Southland was employed as a Senior Janitor at the URI Health Services. During the period of Friday, February 18, 1994 through Monday, February 28, 1994, Southland was absent from his job as Senior Janitor for URI Health Services. As a result of this allegedly unauthorized absence, Southland's supervisor, Ann Wynne, requested that Southland be suspended. (State's Exhibit 12.) However, upon further consideration, Anne Coleman, the Director of Labor Relations, determined that termination would be more appropriate and recommended such.
On March 7, 1994 and April 12, 1994, at the direction of the Department of Human Resources, Nicholas Long (Long), an attorney for the Office of Higher Education, presided over a pre-disciplinary hearing to determine whether, by reason of his absence, Southland resigned pursuant to Personnel Rule 6.04[1] and whether Southland should be terminated for insubordination. (State's Exhibit 18.) Long determined that Southland's February 18, 1994 to February 28, 1994 absence was unauthorized and effectuated a resignation. In the alternative, if the resignation was not accepted, Long recommended that Southland be terminated for insubordination. In a letter dated May 9, 1994, President Robert L. Carothers terminated Southland from his position citing Southland's violation of Personnel Rule 6.04 and gross insubordination as the reasons for the dismissal. (State's Exhibit 19.) As the factual basis for the termination, President Carothers listed the following findings made at the pre-disciplinary hearing:
 "1. On January 25, 1994, you announced via a memorandum to your supervisor that you would be on vacation February 18, 1994 through February 27, 1994 and would return to work on Monday, February 28, 1994.
 2. On January 29, 1994, Ms. Wynne denied your vacation request due to the fact that you were needed on duty while Health Services was servicing students.
 3. On February 17, 1994, Ms. Wynne gave you a reminder in writing that your vacation request had been denied.
 4. On February 17, 1994, you went home `sick' at approximately 11:00 a.m. after receiving the reminder from Ms. Wynne.
 5. On February 18, 1994, you did not report to work, nor did you call your supervisor to notify her of your absence.
 6. On February 21, 1994, you called in to the main phone and left a message that you were out sick on February 21, 1994 and you would be discharging personal leave for the period of February 22-25, 1994.
 7. On February 22, 1994, Ms. Wynne sent you two memos. The first memo requested a doctor's note for your absences on Friday, February 18, 1994 and Monday, February 21, 1994. The second memo notified you that your request for personal leave for the period of February 22-25, 1994 was denied, and that you were to return to work immediately.
 8. On February 23, 1994, Laura Kenerson, Director, Personnel Services, sent a memo notifying you that you were on unauthorized leave, and that if you did not return to work by Monday, February 28, 1994 you would be terminated from employment with the University in accordance with Personnel Rule 6.04.
 9. On February 25, 1994, Ms. Wynne sent a letter to Anne Marie Coleman, Director, Labor Relations, requesting disciplinary action based on your unauthorized absence from work.
 10. On Monday, February 28, 1994, you failed to report back to work.
 11. On March 31, 1994 and April 1, 1994, you were again absent from work without authorization." (State's Exhibit 19.)
Southland appealed his termination to the Personnel Appeal Board. The Board conducted public hearings on February 6, 1996; March 14, 1996; May 23, 1996; October 15, 1996; and April 29, 1997.
At the February 6, 1996 hearing, Ann Wynne (Wynne), the Business Manager at the URI Health Services and Southland's direct supervisor, testified on behalf of URI. In January 1994, shortly after Southland returned from an authorized vacation to Florida, Wynne and Southland had a casual conversation wherein Southland expressed an interest in returning to Florida in February. (2/6/96 Tr. at 7.) According to Wynne, Southland made no mention of any necessity for the time off or any family emergency. (2/6/96 Tr. at 7, 17.) Wynne testified that because Health Services had to be opened and fully staffed while school was in session, vacation time was generally granted during school breaks and denied while school was in session. (2/6/96 Tr. at 5-6.) Due to this policy, Wynne suggested that Southland request vacation time in March during the period of Spring Break as opposed to February so that she could approve the leave. (2/6/96 Tr. at 8.) Southland did not request time in March, nor did he submit the appropriate form for requesting time off. (2/6/96 Tr. at 6, 8, 28.) Instead, Southland subsequently presented Wynne with a memo that stated, "I will be in Florida from Feb. 18, 1994 thru Feb. 27, 1994. I will return to work on Feb. 28, 1994." (State's Exhibit 3.)
Wynne prepared a memo dated January 29, 1994, denying Southland's vacation request and placed the memo on Southland's desk. (2/6/96 Tr. at 9-10; State's Exhibit 4.) In addition, on February 17, 1994 — the day prior to Southland's requested vacation — Wynne personally handed Southland a second memo again stating that his request for vacation was denied. (2/6/96 Tr. at 11; State's Exhibit 5.) After receiving the memo, Southland went home sick and did not return to work the next day, Friday, February 18, 1994. (2/6/96 Tr. at 10-11.) The following Monday, February 21, 1994, Wynne received a message from the telephone operator indicating that Southland phoned to inform Wynne that he was taking a sick day for February 21st and would be out for the remainder of the week on personal leave. (2/6/96 Tr. at 12.) The period of Southland's projected absence coincided with that which had been previously denied by Wynne. (2/6/96 Tr. at 12.)
In response to Southland's absence, Wynne sent a certified letter dated February 22, 1994 to Southland informing him that his request for personal time was denied and that he was to report to work immediately. (State's Exhibit 8.) Additionally, Wynne sent a letter dated February 22, 1994 requesting a letter from a doctor verifying Southland's alleged sickness on Friday, February 18, 1994, and Monday, February 21, 1994. (State's Exhibit 7.) On February 23, 1994, a letter from Laura Kenerson, Director of Personnel Services, was mailed to Southland informing him that the failure to return to work by Monday, February 28, 1994 would result in termination. (2/6/96 Tr. at 38; State's Exhibit 9.) Southland did not return to work on February 28, 1994. (4/29/97 Tr. at 18.)
The University of Rhode Island also offered the testimony of Anne Coleman (Coleman), the Director of Labor Relations. Normally, Coleman would have presided over the pre-disciplinary hearing. However, prior to the hearing, Southland sent a letter to President Carothers implicating Coleman in illegal activity. (3/14/96 Tr. at 10.) In spite of not having presided over the pre-disciplinary hearing that resulted in Southland's termination, Coleman represented URI with respect to hearings concerning two subsequent unauthorized absences. While the present matter was pending, on both March 31, 1994 and April 1, 1994, Southland was absent from work without authorization. (3/14/96 Tr. at 22.) When URI refused to compensate Southland for these two absences, he appealed to the Board. The Board determined that Southland had not acquired the requisite approval for the absences and thus, was not entitled to compensation for those two days. (State's Exhibit 21.)
Although she did not determine the appropriate discipline in Southland's case, Coleman testified that such excessive unauthorized absence from work constituted egregious conduct for which termination, as opposed to progressive discipline, was appropriate. (3/14/96 Tr. at 28.) Moreover, Coleman opined that Southland's disregard of his supervisor's clear denial of vacation time for the period of February 18, 1994 through February 28, 1994 and the subsequent disregard of the denial of leave on March 31, 1994 and April 1, 1994 constituted gross insubordination. (10/15/96 Tr. at 32.)
Finally, Southland presented his testimony to the Board. According to Southland, his brother required assistance because he was depressed and suicidal. (4/29/97 Tr. at 10.) Southland testified that he received a phone call on January 10, 1994 from his sister-in-law requesting that he return to Florida because Southland's brother was "back into that condition of suicidal." (4/29/97 Tr. at 11.) Contrary to Wynne's testimony, Southland claimed that he informed Wynne of his brother's condition and that Wynne asked him to let her know as soon as he booked a flight. (4/29/97 Tr. at 12.) Southland testified that on January 10, 1994, immediately after booking his nonrefundable airline tickets for a February trip to Florida, he informed Wynne of the dates that he would be visiting his ailing brother. (4/29/97 Tr. at 13.) According to Southland, Wynne had no problem with his taking the time off in February. (4/29/97 Tr. at 13.) Southland claimed that, despite having received the information concerning Southland's trip and seemingly approving it on January 10, Wynne asked him to prepare a memo with the exact dates of his leave on January 24, 1994. (4/29/97 Tr. at 14-15.) Moreover, Southland denied having received Wynne's memo dated January 29, 1994, denying his request for vacation time. (4/29/97 Tr. at 15.) However, Southland acknowledged having received the memo dated February 17, 1994, wherein Wynne denied the request for vacation time. (4/29/97 Tr. at 16.) Notwithstanding his receipt of the denial memo on February 17, 1994, Southland boarded the plane for Florida and visited his brother. (4/29/97 Tr. at 48.) According to Southland, although Wynne denied his vacation request, she did not tell him that he could not go to Florida. (4/29/97 Tr. at 47.)
Both URI and Southland submitted briefs to the Board at the conclusion of the hearings. On January 5, 1998, the Board issued the Decision, which upheld the termination of Southland. From that Decision, Southland timely filed this appeal.
 STANDARD OF REVIEW
Final orders of the Personnel Appeal Board are reviewed by this Court pursuant to § 42-35-15. Specifically, the scope of review is limited by § 42-35-15(g) which provides:
 "(g) The court shall not substitute its judgments for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law; [sic]
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
Acting as an appellate court, this Court's review of an agency decision is limited to a determination of whether legally competent evidence supports the decision. Barrington Sch. Comm.v. R.I. State Labor Relations Bd., 608 A.2d 1126, 1138 (R.I. 1992). The trial justice "may not substitute his or her judgment for that of the administrative agency" on questions of fact.Bunch v. Bd. of Review, 690 A.2d 335, 337 (R.I. 1992). "Substantial evidence" is defined as that which "a reasonable mind might accept to support a conclusion." Newport Shipyard v.R.I. Comm'n for Human Rights, 484 A.2d 893, 897 (R.I. 1993). "If there is sufficient competent evidence in the record, the court must uphold the agency's decision." Johnston Ambulatory SurgicalAssocs., Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000).
 EVIDENTIARY RULINGS OF THE BOARD
When the final day of hearings before the Board arrived, Southland's newly retained counsel renewed a request to the Board for a subpoena of President Carothers. (4/29/97 Tr. at 2.) The Board denied the request because Southland had failed to submit a brief in support of the subpoena within the thirty-day period previously designated by the Board. (4/29/97 Tr. at 2.) Furthermore, the Board determined that President Carothers' testimony would be irrelevant because President Carothers had not presided over the pre-disciplinary hearing and had "probably signed a piece of paper that was given to him by a hearing officer." (4/29/97 Tr. at 2-3.) The Board determined that a case had not been made as to what President Carothers' presence would accomplish. (4/29/97 Tr. at 3.) Southland argues that the Board acted arbitrarily by refusing to issue a subpoena for President Carothers.
Rhode Island General Laws (1956) § 36-3-10.1 authorizes the Board to subpoena any witness for a hearing. The Board is vested with discretion as to the admissibility of evidence. SeeEnvironmental Scientific Corp. v. Durfee, 621 A.2d 200, 203
(R.I. 1993). Section 42-35-10 of the Administrative Procedures Act provides: "[i]rrelevant, immaterial, or unduly repetitious evidence shall be excluded." When the request for a subpoena was presented, the Board had already heard testimony from Ann Wynne, Southland's direct supervisor and witness to the underlying facts of his termination. The Board was aware that President Carothers had not presided over the pre-disciplinary hearing. Moreover, Southland made no argument about what, if anything, President Carothers' testimony would add to a hearing which had continued for a period of one year. Thus, the Board did not act arbitrarily or abuse its discretion by refusing to subpoena a witness whose testimony would have been repetitious and irrelevant.
Finally, with respect to evidentiary presentations, Southland contends that "the Board abruptly ended the hearing without giving [him] the full opportunity to present his case to the Board." (Mem. of Petitioner at 7.) However, the record does not support this assertion. On the contrary, at the end of the final day of hearings Mr. Pearson, the Vice-Chairman of the Board, stated, "Alright. Alright. Ah, nothing further to submit than [sic]." (4/29/97 Tr. at 51.) Southland's counsel responded with "No." (4/29/97 Tr. at 51.) Therefore, Southland's contention that he was not given a full opportunity to present his case is without merit. Substantial due process rights of Southland were not thereby prejudiced.
 DECISION OF THE BOARD
After considering the evidence, the Board made the following factual determinations:
 "1. Gerard Southland was aware of the University's policy that vacation was not normally awarded when the Health Services facility was open, and he was further aware that all vacation in that facility had to be requested in a timely manner on a particular form. He must also have been aware that providing `advance notice' by him was not the same as obtaining an `authorized absence' from the University.
 2. On January 10, almost seven weeks prior to his departure, he bought `non-refundable' airline tickets with no indication of having made any request for vacation. Only after the purchase did he mention that he planned to be away from the University for a period of almost 12 days.
 3. On February 17, the day before his departure, he was aware his supervisor was still refusing to confirm the vacation time.
 4. Despite receiving a written memo telling him he was not being granted vacation, he departed on that day.
 5. At no time did he ever explain why he failed to use the mandatory form to request vacation instead of resorting to verbal comments and a memo to his supervisor advising her he was leaving.
 6. Although he attempted to use sick time, along with some personal time, to cover his absence from the University, he never presented any evidence to indicate he was sick during his absence, nor did he present any evidence to indicate that his brother in Florida was sick. It should be noted that the Board is particularly struck by the span of seven weeks between the time he bought the airline tickets and the onset of the sickness by either him or his brother." (Decision at 4-5.)
Based on these factual findings, the Board decided that Southland violated Personnel Rule 6.04. Furthermore, the Board determined that Southland was grossly insubordinate when he willfully ignored the University's policies concerning authorization of vacation and attempted to cover his absence after the fact by using sick and personal time. (Decision at 5.)
On appeal, Southland argues that the Board's Decision was clearly erroneous in light of the substantial evidence on the record. Southland asserts that there was no evidence to support a finding of gross insubordination, and absent such a finding, some lesser discipline, as opposed to termination, should have been utilized by the Board.
The Rhode Island Supreme Court has defined "insubordination" as "an intentional defiance of authority." McKinnon v. HousingAuthority, 114 R.I. 686, 690, 338 A.2d 517, 519 (1975). At the hearing, Southland testified that on February 17, 1994, Wynne requested that he submit the proper request for vacation so that it could be approved. (4/29/97 Tr. at 37.) Southland claimed that he did not submit the request because he was "highly suspicious" that it would be denied. (4/29/97 Tr. at 37.) Subsequently on cross-examination, Southland acknowledged having received the vacation denial from Wynne on February 17, 1994. However, instead of complying with the denial, Southland left work and did not return until after his vacation to Florida. Moreover, Wynne testified concerning Southland's blatant disregard for her authority over approving time off from work. Coleman also testified about Southland's excessive absence from work and her opinion that such excessiveness constituted gross insubordination. It is not the function of this Court to weigh the credibility of the evidence. Barrington Sch. Comm.,608 A.2d at 1138. Reliable, competent evidence in the record supports the Board's determination that Southland intentionally defied authority in a manner that constituted gross insubordination.
Article 24 of the Collective Bargaining Agreement authorizes the discharge of employees for just cause.[2] "Although the penalty of discharge has from time to time been referred to as a capital penalty in the labor context, it is equally true that direct and flagrant insubordination constitutes a capital offense in the context of employer-employee relations." Rhode IslandLaborers' District Council v. State, 592 A.2d 144, 146 (R.I. 1991). Moreover, a trial court may not substitute its judgment for that of an agency with respect to the imposition of a sanction when competent evidence supports the factual findings of the agency. See Rocha v. Public Utilities Comm'n,694 A.2d 722, 726 (R.I. 1997). Based on the Board's determination that Southland was grossly insubordinate by willfully ignoring the policies of his employer and the decision of his supervisor, dismissal did not constitute an abuse of discretion.
 CONCLUSION
After a review of the entire record, this Court finds that the Decision of the Board upholding the termination is not clearly erroneous and is supported by substantial evidence. Furthermore, the Board did not abuse its discretion. The Decision was not made upon unlawful procedure. Substantial rights of the appellant have not been prejudiced. Therefore, the Decision of the Board is affirmed.
Counsel shall submit the appropriate judgment for entry.
[1] Personnel Rule 6.04 provides in pertinent part, "Any employee, who is absent from duty without authorized leave for five consecutive working days . . . shall be deemed to have resigned without notice." (State's Exhibit 11.)
[2] Section 24.1 provides in pertinent part:
 "Disciplinary action may be imposed upon an employee only for just cause. . . . Where appropriate, disciplinary action or measures shall include only the following:
 1. Oral Reprimand
 2. Written Reprimand
 3. Suspension
 4. Discharge
 5. Demotion where appropriate." (Joint Exhibit 1.)