DECISION
Appellant, Commerce Park Commons, LLC ("Commerce Park" or "Appellant"), challenges the Town of West Greenwich Zoning Board of Review's ("Board") decision granting dimensional height variances to Appellee, Immunex Manufacturing Corporation ("Immunex" or "Appellee"). Appellant and Appellee are abutting landowners. This Court has jurisdiction pursuant to R.I.G.L. 1956 § 45-24-69. For the reasons set forth, the decision of the Board is affirmed in part and remanded in part.
 FACTS AND TRAVEL
At all times material hereto, Appellee was either the owner of property identified as Assessor's Plat 3 Lots 1.2, 1.4 and 1.5 and located at 40 Technology Way, West Greenwich, Rhode Island or was the purchaser of such property under a purchase and sales agreement.
Appellee manufactures a medication called ENBREL, which purportedly reduces the symptoms associated with rheumatoid arthritis. ENBREL is a pharmaceutical product which is produced through a biological process as opposed to a chemical one. (Sept. 18, 2001 Tr. at 14). The biological process involves growing living cells in a liquid mixture. Id. As the cells develop, they produce a protein by-product which is then extracted from 20,000 liters of liquid. Id. Once the protein is extracted, it is then sold as a drug to ease the symptoms associated with rheumatoid arthritis. Immunex has enjoyed success with the product and the drug has been approved even for pediatric use.
Currently, Immunex manufactures ENBREL in Germany and ships the product to the United States for consumption. Due to increased demand for ENBREL, Appellee determined that it "needed a tremendous amount of capacity" in order to augment production of ENBREL. (Sept. 18, 2001 Tr. at 12).
At the time of the application in August 2001, Greenwich Holdings, Inc. was the owner of the property and Appellee was listed as the purchaser. Greenwich Holdings, Inc. owned the property since September 24, 1999. According to the record, Appellee has or will purchase the property from Greenwich Holdings, Inc. in 2002. (Sept. 18, 2001 Tr. at 12).[1] At the present time, Appellee is preparing pharmaceuticals in the Production "A" Building, an existing structure already located on the property. (Sept. 18, 2001 Tr. at 22).
In March 2001, Immunex petitioned the Board for permission to expand its current manufacturing capacity. At that time, the Board granted Immunex a height variance of seventy feet for the construction of an addition to the manufacturing plant.
Under this plan, the plant would house three 20,000 liter vessels capable of aiding in the fermentation process. After reconsidering the company's long-range goals, Immunex abandoned plans to expand the current manufacturing facility and proposed a new plant in a campus-style setting. (Sept. 18, 2001 Tr. at 13). Specifically, Appellee is proposing six new structures: (1) a Quality Control Lab, (2) a Central Utility Building, (3) a Warehouse, (4) a Production "B" Building, (5) an Administration Building, and (6) a two-level parking structure. The Production "B" Building would house nine 20,000 liter vessels which would require a height variance for ninety feet. The Quality Control Lab, Central Utility Building "B", Warehouse, and Administration Building would require height variances as well. (Sept. 18, 2001 Tr. at 18).
On August 20, 2001, Immunex submitted an application for dimensional height variances on four structures to the Board. The application listed two uses on the property: (1) Manufacturing-Pharmaceutical Preparations and (2) Utility Generation. On September 18, 2001, the Board held a hearing on Immunex's petition. At that time, Immunex amended its application to add a request for a dimensional variance on a fifth structure, the Warehouse. On September 25, 2001, the Board conducted a second hearing and on September 26, 2001, issued a decision granting five dimensional height variances to Appellee.
The Town of West Greenwich Zoning Ordinance ("ordinance") designates the subject property as Industrial A. The purpose of an Industrial A zone is:
 to provide areas for the future development of industrial and allied uses and to provide for existing uses of this nature. Areas so designated are considered to be geographically and topographically suitable for such use and are so designated in the interest of providing for the future economic growth of the community.
(Ordinance Section 6 (A)).
This classification under the ordinance permits pharmaceutical production in an Industrial A district as a matter of right. In other words, a property owner could construct a pharmaceutical manufacturing facility with a height less than forty feet without obtaining zoning relief from the Board. In fact, the property previously had been used for pharmaceutical production. However, at some point, pharmaceutical production surceased. Recently, under Immunex's control, pharmaceutical production resumed.
Currently, there are two buildings situated on the property, the Production "A" Building, a manufacturing facility, and the Central Utilities Building. After Appellee entered into the agreement with Greenwich Holdings, Inc. to purchase the property, it proposed an ambitious plan to expand the current facilities for pharmaceutical manufacturing. (Sept. 18, 2001 Tr. at 12, 22). To effectuate those plans, Immunex sought dimensional variances from the Board.
Appellant and abutting landowner, Commerce Park, asseverates that Immunex has failed to satisfy the threshold burden of proving that it cannot enjoy a "single", legally permitted beneficial use of its property without the proposed variances. (Appellant's Memorandum at 6-7). Appellant argues in the alternative that even if Immunex satisfied its threshold burden, Immunex did not prove that the requested variances were the least relief necessary. Appellant also contends that Immunex needed a special-use permit in order to expand the Utility Generation use on the property. According to Appellant, Immunex never applied for a special-use permit. Finally, Appellant claims that Immunex was barred from petitioning for relief under the doctrine of administrative finality. For these reasons, Appellant contends that the Board's 4 decision granting Appellee's requested relief was affected by error of law and was clearly erroneous.
For its part, Immunex challenges Appellant's standing in the instant appeal; claims that the doctrine of administrative finality does not apply; and argues that the Board properly reviewed Immunex's application under the standard enunciated in R.I.G.L. 1956 § 45-24-41 and Sciaccav. Caruso, 769 A.2d 578 (R.I. 2001).
 STANDARD OF REVIEW
General Laws § 45-24-69 provides in relevant part that when reviewing the decision of a zoning board of review, the Superior Court:
 shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The Court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
When reviewing the decision of a zoning board of review, this Court must examine the entire certified record to determine whether substantial evidence exists to support the findings of the zoning board of review.Salve Regina College v. Zoning Bd. of Rev., 594 A.2d 878, 880 (R.I. 1991) (citing DeStefano v. Zoning Bd. of Review of Warwick, 122 R.I. 241, 245,405 A.2d 1167, 1170 (1979)). "Substantial evidence as used in this context means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means an amount more than a preponderance." Caswell v. George Sherman Sand and Gravel Co., Inc.,424 A.2d 646, 647 (R.I. 1981) (citing Apostolou v. Genovesi, 120 R.I. 501, 507, 388 A.2d 821, 825 (1978)). The essential function of the zoning board of review is to weigh evidence with discretion to accept or reject the evidence presented. Bellevue Shopping Center Associates v. Chase,574 A.2d 760, 764 (R.I. 1990). Moreover, this Court should exercise restraint in substituting its judgment for the zoning board of review and is compelled to uphold the Board's decision if the Court "conscientiously finds" that the decision is supported by substantial evidence contained in the record. Mendonsa v. Corey, 495 A.2d 257, 260 (R.I. 1985) (quotingApostolou v. Genovesi, 120 R.I. 501, 509, 388 A.2d 821, 825 (1978)).
 ANALYSIS
As a preliminary matter, the Court rejects Immunex's challenge to Appellant's standing to bring the instant appeal. As an abutting landowner, Appellant was entitled to receive notice of Immunex's application for zoning relief. R.I.G.L. 1956 § 45-24-53 (c) (2). Therefore, as a recipient of notice, Commerce Park has standing to appeal the Board's decision. Further, Appellant is an aggrieved party since it is conceivable that the decision could "adversely affect in a substantial manner some personal or property right of the party or impose upon it some burden or obligation." Johnston Ambulatory SurgicalAssociates, Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000) (quoting,Liguori v. Aetna Casualty and Surety Co., 119 R.I. 875, 880, 384 A.2d 308, 311 (1978); See also, Flynn v. Zoning Bd. of Review, 77 R.I. 118,73 A.2d 808 (1950) (neighboring property owner within same zoning district has standing for review of a zoning board's decision since proposed relief would "naturally and reasonably affect the value and use of property in the immediate vicinity"). The grant of a dimensional variance to Immunex directly affects Appellant's rights in its abutting property. Consequently, Appellant has standing to pursue the instant appeal.
 Doctrine of Administrative Finality
Appellant claims that the doctrine of administrative finality barred the Board from considering Appellee's request for dimensional relief in September 2001. According to Appellant, the Board granted Appellee's request for a dimensional height variance of seventy feet in March 2001. Since the Board already granted Appellee similar relief on the same property, the Board was precluded from reconsidering Appellee's petition and granting Appellee new relief.
Under the doctrine of administrative finality, "when an administrative agency receives an application for relief and denies it, a subsequent application for the same relief may not be granted absent a showing of a change in material circumstances during the time between the two applications." Johnston Ambulatory Surgical Associates, Ltd. v. Nolan,755 A.2d 799, 808 (R.I. 2000) (citing, Audette v. Coletti, 539 A.2d 520, 521-22 (R.I. 1988) (Emphasis added). The rule "applies as long as the outcome sought in each application is substantially similar." Johnston,
755 A.2d at 808. "The purpose of the doctrine is to promote consistency in administrative decision-making, such that if the circumstances underlying the original decision have not changed, the decision will not be revisited in a later application." Id. at 810. However, the rule is not entirely preclusive. An applicant bears the "light" burden of "demonstrat[ing] and identify[ing] circumstances that have materially changed since a previously rejected application." Id. (Emphasis added). In March 2001, the Board granted Immunex's request for a dimensional variance. The Board never denied Immunex's petition. Therefore, a necessary element for the invocation of the doctrine has not been satisfied, namely a rejected application. As a result, Immunex's request for zoning relief in September 2001 was not barred by the doctrine of administrative finality.
Even if the doctrine did apply, Immunex has demonstrated changed circumstances. The record reveals that the September 2001 application is very different from the first application submitted in March 2001. The March 2001 petition requested a dimensional height variance of seventy feet for the construction of an addition on the Production "A" Building. This application anticipated the construction of an addition to an existing building on the site. As Susan Erb, Vice-President for Corporate Facilities and Engineering Immunex Corporation, testified, market demand for ENBREL exceeded Immunex's current manufacturing capabilities thus necessitating the need for a new manufacturing plant. (Sept. 18, 2001 Tr. at 12). Immunex's circumstances had changed sufficiently from March 2001 to September 2001 to warrant the Board's consideration of Appellee's application.
 The Dimensional Variance
According to Appellant, Immunex failed to establish that there is no other reasonable alternative to enjoy a "single" legally beneficial use of its property. (Appellant's Memorandum at 7). Appellant proposes that this Court employ a narrow interpretation of the standard established inSciacca v. Caruso, 769 A.2d 578 (R.I. 2001). Appellant argues that "no other reasonable alternative" requires that an applicant demonstrate that there is no other use for a property other than the relief requested. Appellant has misstated the burden an applicant bears when requesting a dimensional variance.
It is now well-settled in this jurisdiction that in order to obtain a dimensional variance, a property owner must demonstrate "that the hardship suffered by the owner of the subject property if the dimensional variance is not granted amounts to more than a mere inconvenience, which means that there is no other reasonable alternative to enjoy a legally beneficial use of one's property." R.I.G.L. 1956 § 45-24-41 (d) (2);Sciacca v. Caruso, 769 A.2d 578, 583 (R.I. 2001); Bernuth v. Zoning Bd.of Review, 770 A.2d 396, 401 (R.I. 2001). A showing of hardship is a necessary threshold for an applicant seeking a dimensional variance.Sciacca, 769 A.2d at 585. An applicant also bears the burden of showing that a factual basis appears in the record to support the statutory requirements allowing for dimensional relief, namely that there is "no other reasonable alternative." Bernuth, 770 A.2d at 401.
The word "single", as used by Appellant, does not appear in the statute or the relevant case law. Appellant's interpretation of a dimensional variance applicant's burden of proof is more akin to that of one seeking a use variance. In order to obtain a use variance, an applicant must demonstrate that the property "cannot yield any beneficial use if it is required to conform to the provisions of the zoning ordinance." R.I.G.L.45-24-41(d)(1) (Emphasis added). The use variance standard is directed towards the prevention of an all-out taking of property under the guise of zoning. "When all beneficial use of property is deprived by governmental restrictions, there is no question that an unconstitutional taking can occur even in the absence of physical entry. . .Whether a taking has occurred depends upon whether the restriction practically or substantially renders the land useless for all reasonable purposes."Annicelli v. Town of South Kingstown, 463 A.2d 133, 139 (R.I. 1983) (internal quotes and citations omitted); See also Palazzolo v. RhodeIsland, 150 L.Ed.2d 592, 606 (2001); Lucas v. South Carolina CoastalCouncil, 505 U.S. 1003, 1015, 120 L.Ed.2d 798, 112 S.Ct. 2886 (1992) (a regulation which denies all beneficial use of land requires compensation under the Takings Clause); Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 67 L.Ed. 322, 43 S.Ct. 158 (1922) ("while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking"). A dimensional variance on the other- hand, does not require such a drastic showing. The standard for a dimensional variance speaks to alternative enjoyment of the property in contemplation of a legally permitted use. It goes without saying that an applicant for a dimensional variance already enjoys a legally permitted use. The issue in a dimensional variance application, therefore, is whether reasonable
alternatives exist for the owner to enjoy the use of his or her property. Appellant's proposed standard would have the effect of transforming the burden for obtaining a dimensional variance into that of a use variance. Such a result is unsupported by statute or case law, and this Court declines the opportunity to transmogrify the two standards.
Having clarified the applicable standard in the instant matter, the Court addresses the question whether Appellee established in the proceedings below that there were no other reasonable alternatives to enjoy a legally beneficial use of its property. R.I.G.L. 1956 §45-24-41(d)(2) (Emphasis added). The term "reasonable" enjoys a long history in the Anglo-American legal tradition. Black's Law Dictionary defines "reasonable" as "fair, proper, or moderate under the circumstances." Black's Law Dictionary, 7th ed. 1999 at 1272. The following has also been said of the word:
 It is extremely difficult to state what lawyers mean when they speak of `reasonableness.' In part the expression refers to ordinary ideas of natural law or natural justice, in part to logical thought, working upon the basis of the rules of law.
Black's Law Dictionary, at 1272 (quoting, John Salmond, Jurisprudence 183 n. (u) (Glanville L. Williams ed., 10th ed. 1947). The word "reasonable" also helps to define such legal concepts as the reasonable person and reasonable doubt. See State v. Barrett, 768 A.2d 929, 938 (R.I. 2001) (reasonable person standard in negligence compares a defendant's behavior with "the usual or proper societal behavior"); State v. O'Brien,774 A.2d 89, 110 (R.I. 2001) (reasonable doubt is one that "would make a reasonable person hesitate to act in regard to some transaction of importance and seriousness"). Its use as an adjective is necessarily a fluid concept that must be applied to the facts of a particular case. Therefore, the Court must evaluate Immunex's application under this concept of reasonableness and determine whether there was sufficient evidence before the Board to warrant a finding that no other reasonable alternative existed for Immunex to enjoy a legally permitted beneficial use of its property.
 Production "B" Building
Bob Bader, the vice-president of products and technology at Kinetics Biophram Company, testified as an expert on the construction and design of biopharmaceutical manufacturing plants. Mr. Bader attested that cells which produce the protein for ENBREL must grow in a sterile environment. (Sept. 18, 2001 Tr. at 67). He explained:
 [W]e have to clean the equipment and it has to be sterilized before we run the process in it. So all of the equipment from here on down gets cleaned and it gets steamed every time we use it, steam sterilized. And that results in a lot of piping. . .It's also one of the major reasons that we had to stack up the height because as we clean, we can use the gravity so that we can minimize the amount of water that we need to clean. And the same is true with steaming. While you steam, you steam from the top on down. So that's why it's stacked up this way.
 In terms of the rooms that this equipment is in, they're in what we call clean rooms which are like hospital operating rooms. They're actually cleaner than hospital operating rooms and there are a lot of air changes, a lot of infiltration that goes on. . . [W]e actually have worked very hard to hold it to ninety feet of height. And there's not a lot of extra space in this building at all.
(Sept. 18, 2001 Tr. at 68-69).
Water usage is a concern for the project. Following consultation with the Kent County Water Authority, Ms. Erb testified that Immunex would use "anywhere from one- million-one to one-million-three" gallons of water per day. (Sept. 18, 2001 Tr. at 76).
Nicholas Cambio, a principal of Appellant Commerce Park, appeared at the hearing and made the following statement anent water usage in the district for the proposed facility:
 I would just like to make one statement, then ask one question, if possible. The statement as to water use, my project will be demanding in excess of 1.3 million gallons of water per day. The Kent County Water System or authority are aware of this issue. On a yearly basis we have updated them for our projected use. They have told us repeatedly if we were to ask for that demand today, it would not be available. It will only become available as time wears on and as Kent County employs more wells and more facilities to strip the water of iron and so on and so on. So, there is going to be a major competitive situation for the water between myself and Immunex. I believe I was here first. I believe I've been in the Town of West Greenwich longer, and I also believe that the request to Kent County by me has been for the last several years. Now, having said that, the competition for water remains to be seen who gets it and who doesn't.
(Sept. 18, 2001 Tr. at 134-35). Immunex's proposed use of the gravity-driven system minimizes that amount of water usage thereby minimizing the amount of runoff into the septic system. It is interesting to note that the requested variance apparently would alleviate rather than aggravate the concerns raised by Appellant at the hearing.
Mr. Bader further stated that a ninety feet height variance was required for the Production "B" Building because Appellee needs to be able to add powder to the tanks which house the cells. The powder itself is "brought into the building in stainless steel bins" which measure approximately six feet tall and four feet by four feet. (Sept. 18, 2001 Tr. at 69). The powder bins are then picked up and placed on top of the cell tanks in order to drop the powder into the tanks. Id. at 70.
Mr. Bader also addressed the design changes which were modified following the initial request for a seventy foot height variance in March 2001. He stated:
 A couple of things have changed since that initial planning was done. One is that the scale of the equipment for the upstream part of the plant has grown. These tanks are larger than what we had in that other design. The other thing is that the media prep where we make up the media and where we make up the buffer has been added to the top floor of the building to feed down into the tanks. The reason we did that was to minimize the amount of water we would use in the building. What we're able to do with this design is when we need to clean this equipment, I can clean from down through the hold tank.
 What I'm doing is basically when I clean this equipment, I have to do it every time I make up a new buffer, which I'll be doing many times per day, I can clean from the blue tank which is the buffer prep tank that changes through the third floor of the building, clean down through that through the filtration equipment, which is on the third floor of the building, which is cyan blue, I guess, down through the bumper hold tank which is the green tank on the second floor of the building, and then actually down into the purification equipment on the first floor. So all of this equipment, all of this piping gets cleaned at one time, and that greatly reduces the amount of water we need in the building and the amount of detergents and those types of things.
(Sept. 18, 2001 Tr. at 72-73).
The Board heard additional testimony in favor of the height variance for the Production "B" Building. Appellant appeared at the hearing through its principal, Nicholas Cambio, and made the following statement in support of Immunex's application for zoning relief:
 As to the height it appears (sic) that the Board will ultimately endorse this height, which may be a good thing. The question I'm asking is, I've been asked from a document storage company if I would lease them or sell them a piece of land along the highway, and they want to do at least a (sic) 100-foot tall facility. So, I am assuming that you are setting a precedent that will allow 90, 100, 150 feet tall height buildings, and I am glad to see this because I'll be back. Thank you.
(Sept. 18, 2001 Tr. at 135).
The record reveals that there was substantial evidence before the Board to support the Board's finding that Immunex had no other reasonable alternative to enjoy a legally beneficial use of its property. See
R.I.G.L. 1956 § 45-24-41(d)(2). The process for growing the proteins necessitates the use of 20,000 liter tanks. These tanks require constant cleaning involving a complex gravity-driven system which reduces water waste. The cleaning process itself involves a series of pipes transposing several floors and requiring additional space. Furthermore, powder must be added to the tanks. The powder is contained in large stainless steal containers measuring six feet tall and four feet wide. Appellee needs room above the 20,000 liter tanks to lift the powder containers and deposit the powder into the tanks. In order to meet U.S. market demand for ENBREL, ninety foot ceilings are necessary for the fermentation process. Therefore, the Board's finding that Immunex established the requisite hardship and proved that no other reasonable alternative exists is affirmed.
The record also reveals that there was substantial evidence before the Board, that the ninety foot height variance is the least relief necessary. According to Mr. Bader, it is not possible to install the aforementioned process in a building with a forty-foot height restriction. Mr. Bader further stated that a building less than ninety feet:
 with this scale of equipment would be impractical. The plants that I am aware of that have the same size of equipment are all taller than this. My company is designing another plant that looks like it's going to be 150 feet tall with the same scale of equipment. So, it really would be very difficult.
(Sept. 18, 2001 Tr. at 73-74). The Court affirms the Board's decision finding that the relief granted was the least relief necessary. R.I.G.L.45-24-41(c)(4).
 The Quality Control Lab
Richard Kuehl, an architect retained for the project by Appellee, testified that the Quality Control ("QC") lab requires additional height space for a total height of sixty-six feet and six inches (66'6"). The floors must be sixteen feet and six inches (16'6") high in order to accommodate the air handling and duct system. According to Kuehl, the mechanical penthouse for the QC lab must be situated on top of the lab floors. (Sept. 18, 2001 Tr. at 60). Specifically, Kuehl stated, "These kinds (sic) of lab buildings have a very unique requirement that for every two square feet (sic) of lab space, you need one square foot of ventilation and mechanical space. We also need some additional space that's required on the roof and that's why that twenty-five percent for that penthouse exists." (Sept. 18, 2001 Tr. at 34-35). The record reveals that there was substantial evidence before the Board, that due to the QC lab's need for ventilation and mechanical space, Appellee had no other reasonable alternative other than to request a height variance.
 The New Administration Building
Mr. Kuehl testified that a sixty-three foot height variance was necessary for the construction of a new administration building for two reasons. First, according to Mr. Kuehl, the first floor in the new Administration Building required a height of sixteen feet and six inches (16'6") in order to match the existing Production "A" Building. The proposed new Administration Building would be attached to the Production "A" Building via a second story link. (Sept. 18, 2001 Tr. at 32-34). Since the floors in the Production "A" Building have a height of sixteen feet and six inches (16"6'), in order for the new Administration Building to connect with the Production "A" Building, the floors need to correspond. Second, Mr. Kuehl stated that "good engineering practice would put" mechanical penthouses on the top of the buildings. (Sept. 18, 2001 Tr. at 60). Mr. Kuehl further opined that he would not recommend placing mechanical penthouses on ground level. Based on Mr. Kuehl's testimony, Appellee had no other alternative if it hoped to connect the new Administration Building with the Production "A" Building. The Production "A" Building already had sixteen feet and six inches (16'6") ceilings. The record reveals that there was substantial evidence before the Board that Appellee established that there is no other reasonable alternative to connect the two buildings.
 Central Utility Building
Mr. Kuehl also testified that "good engineering practice" required the placement of mechanical penthouses on the roof of the CUB Building "B". In the CUB Building "B", the transformers and switch gear are located on the second floor. (Sept. 18, 2001 Tr. at 60). Placing the mechanical penthouse on the roof of the building made "good engineering practice" since a "lot of utilities [would be located] underneath it." (Sept. 18, 2001 Tr. at 60). Mr. Kuehl did state that the utilities could be placed underground but that such a placement was not logical since the site was "loaded with underground utilities." Based on the underground density of the utilities and because the transformers and power is located on the second floor of CUB Building "B", substantial evidence exists supporting the Board's decision that Immunex had no other reasonable alternative other than to put the generators on top of the building.
 The Warehouse Building
Anent Immunex's proposed Warehouse, the record fails to limn any evidence of substantial hardship. "An applicant seeking a dimensional variance has the burden. . . of showing that a factual basis appears in the record to support the proposition that there is `no other reasonable alternative' that would allow the applicant to enjoy a legally permitted beneficial use of the property." Bernuth, 770 A.2d 396, 401 (R.I. 2001). It is unclear to the Court whether the Board found that the Applicant provided sufficient evidence that there is no other reasonable alternative to the requested relief.
Mr. Kuehl testified at the hearing:
 We want to amend the application that that space would be at 50 feet and purely because in further designing that warehouse space, the client wants to have a clear span space to house all the storage facilities that are in there. The trusses got much deeper. They're ten feet deep. So that made us kick up the roof. It's purely a structural enclosure, not a functional requirement to kick up the height.
(Sept. 18, 2001 Tr. at 35-36).
In its decision, the Board found:
 Mr. Kuehl testified that although it was not shown in the application or on the plans, the Applicant was proposing to construct a 160' X 160' portion of the Warehouse Building at an elevation 50'. This is necessary because Applicant needs clear span space within the Warehouse so the steel trusses are larger than originally anticipated and more clearance was required.
(Board Decision at 5).
The Board determined that Applicant required a dimensional variance to effectuate its plan for "clear span space" within the Warehouse. However, in its decision, the Board failed to set forth the factual basis for such finding. The Board's decision fails to address whether or not the Applicant has a reasonable alternative available to it, such as expanding the footprint of the building. See Bernuth, 770 A.2d at 401 (reasonable alternatives could include physically relocating a house or building a new house on another lot).
As the Applicant before the Board seeking relief, Immunex bore the burden of establishing no other reasonable alternative. Sciacca, 769 A.2d at 585; Bernuth, 770 A.2d at 401. If the Applicant failed to meet this burden, then the Board must deny the relief sought.
A zoning board's decision must include "all findings of fact and conditions", R.I.G.L. 1956 § 45-24-61, and the "reasons for the action taken." Sciacca, 769 A.2d at 585 (quoting, Irish Partnership v.Rommel, 518 A.2d 356, 358 (R.I. 1986)). The board's findings must be "factual rather than conclusional, and the application of the legal principles must be something more than the recital of a litany." Id. A zoning board of review has an obligation to elucidate its conclusions and reasoning. Sciacca, 769 A.2d at 585; Bernuth, 770 A.2d at 401. The Board's decision fails to illustrate a factual basis upon which the Board could have determined that Appellee has no "other reasonable alternative" to construct a Warehouse consistent with the maximum height requirements as set forth in the ordinance. As a result, this case is remanded to the Board for further explication by the Board. R.I.G.L. 1956 § 45-24-69;See also, Roger Williams College v. Gallison, 572 A.2d 61 (R.I. 1990) (remand appropriate when there is a defect in the proceedings in the first instance, however, such action does not afford another opportunity for an applicant to present its case when the evidence presented initially is inadequate).
On remand, the Board shall specify its factual findings on applicant's request for a height variance regarding the Warehouse. Furthermore, the Board should consider the following factors relevant to dimensional variance analysis. General Laws § 45-24-41(c) and (d) provide the requirements for obtaining a dimensional variance. General Laws §45-24-41(d)(2) is particularly important as is the analogous provision in West Greenwich ordinance Section 3(d) which nearly mirrors the General Law. General Laws § 45-24-41(d)(2) provides in pertinent part that "that the hardship suffered by the owner of the subject property if the dimensional variance is not granted amounts to more than a mere inconvenience, which means that there is no other reasonable alternative to enjoy a legally beneficial use of one's property." R.I.G.L. 1956 § 45-24-41(d)(2). Therefore, the Board shall determine whether a reasonable alternative existed to the granting of a fifty foot height variance for the Warehouse, and the Board must set forth its factual findings. The scope of this remand is limited solely to a further explication by the Board as to the reasons it granted a fifty foot height dimensional variance for the Warehouse. This remand does not afford Appellee another opportunity to present its case if the evidence initially presented was inadequate.
 Accessory Use
Appellant argues that Immunex currently enjoys two uses on the property, pharmaceutical preparations and utility generation. According to Appellant under the ordinance, Immunex was required to obtain a special-use permit for the purposes of utility generation. Citing Newtonv. Zoning Bd. of Review, 713 A.2d 239 (R.I. 1998), Appellant contends that Immunex cannot obtain both a dimensional variance and a special-use permit. In Newton, our Supreme Court held that a special-use permit could not be granted along with a request for dimensional relief. Newton, 713 A.2d at 242.
Appellant's reliance on Newton is misplaced. Ms. Laurel Carlson, a senior project manager and regulatory specialist with Environmental Science Services, testified that Immunex's current and proposed utility generation facilities are backup generators solely for the purposes of providing electricity in the event of a power failure. (Sept. 18, 2001 Tr. at 103-104). Ms. Carlson further stated that, "Emergency generators exist in almost every public building, space, hospital, and large complexes such as Providence Place Mall right down to small complexes."Id. at 106.
Immunex's use of emergency generators constitutes an accessory use not necessitating a special-use permit. The ordinance defines "accessory use" as, "A use of land or of a building, or portion thereof, customarily incidental and subordinate to the principal use of the land or building." (Ordinance Section 3 (4)). As Ms. Carlson explained, Immunex's proposed utility generators would operate only in the event of a power failure. Ms. Carlson further testified that many public buildings such as hospitals and malls are equipped with emergency generators. Immunex's utility generation facilities are customarily incidental and subordinate to the principal use, pharmaceutical production. Therefore, they constitute an accessory use. See Town of North Kingstown v. Albert,767 A.2d 659, 664 (R.I. 2001) (farmer's sale and removal of earth in order to construct an irrigation pond in district where earth removal excavation was a prohibited use was only temporary and incidental to the creation of an irrigation pond and thus did not constitute the primary purpose for the land, but rather was an accessory use); Harmel v. ZoningBd. of Review, 603 A.2d 303, 307-308 (R.I. 1992) (parking lot accessory use to restaurant); LaMontagne v. Zoning Bd. of Review, 95 R.I. 248, 250, 186 A.2d 239, 240 (1962) (home basement beauty salon does not constitute an accessory use).
 CONCLUSION
After a review of the entire record, the Court upholds the decision of the Board on all but one variance. The Board's decision granting Immunex dimensional height variances for the Production "B" Building, the Quality Control Lab, the new Administration Building, and Central Utility Building "B" is affirmed. Immunex's proposed utility generation facilities are customarily incidental and subordinate to the pharmaceutical production and are therefore allowable as an accessory use.
As to the granting of a variance to increase the height of the Warehouse Building, the Court remands the case to the Board to clarify its decision, not to conduct further hearings on this issue. If the Board finds that the Applicant has failed to meet its burden of proving that there was no reasonable alternative to the relief sought, then the Board must deny the variance with respect to the Warehouse. If the Board determines that the Applicant has met its burden, then the Board should amend its decision to address the factual findings that support the grant of relief.
Counsel shall submit the appropriate judgment, for entry by the Court after notice.
[1] As of the writing of this decision, it remains unclear to the Court based on the record presented whether title to the subject property has yet transferred from Greenwich Holdings, Inc. to Immunex.