DECISION
In this zoning appeal, Mary Ann and Gerard O'Halloran ("O'Hallorans" or "Appellants") challenge the unanimous Decision of the Zoning Board of Review for the Town of North Kingstown ("Decision" or "Board's Decision") granting Gardner's Wharf Holding, LLC's ("Gardner's" or "Appellee's") application for a special use permit and relief from several conditions imposed upon the property by a May 1996 Decision of the Zoning Board. Appellants specifically allege that the Board's decision to remove those conditions was contrary to the doctrine of administrative finality, failed to make the necessary findings of fact, and ignored the uncontradicted evidence in the record.
For the reasons set forth in this Decision, this Court affirms the Decision of the *Page 2 
Board. Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 I. FACTS AND TRAVEL
The subject property, Lot 258 on Assessor's Plat 117, ("the property") is located at 170 Main Street in North Kingstown, Rhode Island. It is situated within the Wickford Historic District and is zoned Waterfront Business. (June 9, 2009 North Kingstown Zoning Board of Review Decision (the "2009 Decision.")) In May of 1996, the North Kingstown Zoning Board of Review ("Board" or "Zoning Board") granted a special use permit and dimensional variances[1] to Gardner's predecessor in interest, allowing it to operate a retail fish market at the property. (May 14, 1996 North Kingstown Zoning Board of Review Decision (the "1996 Decision.")) In granting this relief, the Board imposed upon the property thirty-three (33) enumerated conditions, contained within the 1996 Decision. Id. Many of these conditions were excerpted from a "Consent Agreement" entered into between Gardner's predecessor and the Rhode Island Department of Environmental Management (RIDEM).[2]
(RIDEM Consent Agreement, December 15, 1995, In Re: Warwick Cove Holding Company, ISDS Application No. 9323-1350). *Page 3 
After operating the fish market at the property for approximately seven (7) years, Gardner's predecessor sold its interest in the property to the Appellee in 2003. (May 26, 2009 Tr. North Kingstown Zoning Board Hearing at 61.)[3] For the next six (6) years, the Appellee continued to operate Gardner's Wharf as a fish market. In January of 2009, however, Gardner petitioned the Zoning Board for a special use permit to allow it to sell hot food as a "take-out" or "carry-out" service. In addition, it requested permission to install an outdoor freezer and fryolators at the property. (2009 Decision). These operations, however, were explicitly prohibited by the Board's 1996 Decision. Therefore, in addition to its request for a special use permit, Gardner also petitioned the Board for relief from the following five (5) conditions of the 1996 Decision:
 14. Any stationary or mobile exterior motor or compressor be prohibited from being operated during the hours of 7:00 p.m. to 8:00 a.m.
 15. All permanent compressors or motors be contained within the building.
 18. The operation will not include a sit-down restaurant or take-out type service.
 25. The operation may not have a fryolator-type frier, grill or any similar cooking device. A single burner stove is permitted to allow preparation of chowder, stuffies and seafood salad and to cook unsold fish and shellfish before spoilage.
 26. No food cooked on premises may be served warmed.
(1996 Decision). The Board held properly advertised hearings on April 28, 2009, May 12, 2009, and May 26, 2009, at which it considered evidence and heard testimony on Gardner's petition. *Page 4 
 A. The Evidence Presented at Hearing
Prior to testimony being presented, the Town Solicitor, James Reilly, issued an instruction to the Board concerning the doctrine of administrative finality.[4] Attorney Reilly explained that, because the Board was being asked to grant relief from conditions it previously imposed upon the property, the Board's inquiry should focus on what changes since those conditions were imposed in 1996 "would warrant" or "justify" the Board's removal of those conditions in 2009. (April 28, 2009 Tr. at 12.) In compliance with this instruction, the Board sought to elicit testimony throughout the hearings regarding what had changed in relation to these conditions over the last thirteen years.
At the hearings, Gardner presented three expert witnesses. All were accepted by the Board as experts in their respective fields. (April 28, 2009 Tr. at 31, 56; May 12, 2009 Tr. at 5.) Edward Pimentel, a former principal planner in the Town of North Kingstown and a Land Use Consultant for Pimentel Consulting Inc., testified as Gardner's planning expert.[5] Paul Bannon, the president of RAB Professional Engineers Inc., specializing in traffic engineering and transportation planning and design, testified as Gardner's traffic expert.[6] Jeffrey Hanson, a project manager for the John P. Caito Corporation and licensed Class 3 ISDS[7] designer, testified as Gardner's ISDS expert.[8] The Board also heard testimony from Susan Licardi, the Town of North Kingstown's *Page 5 
Director of Water Supply, who testified concerning the water usage at the property. (May 26, 2009 Tr. at 3-16.)
In addition, the owner and operator of Gardner's Wharf, Peter Chevalier, testified concerning his operation at the property, the current equipment he employed, and the nature and technology of the equipment he desired to add. Appellant, Marianne O'Halloran, testified on her own behalf, but did not present any expert witnesses to the Board in support of her position. Numerous members of the community also testified throughout the hearings, some speaking in favor of the proposal and some speaking against.
Mr. Pimentel testified that "the unique, most vital change that has happened since the initial operation and those conditions of approval" was the Town's enactment of the Wickford Village Plan ("WVP") in 1998[9] — a plan specifically created to address the unique nature and needs of Wickford Village proper.Id. at 32-33, 38; Petitioner's Ex. 4, Excerpts from WVP. The WVP was developed based on studies and surveys of Wickford and its residents. (April 28, 2009 Tr. at 37-38; Petitioner's Ex. 4, p. 4.) These surveys indicated that the "variety of services" offered in Wickford Village was what people who came to the village liked most about it. Id. As a result, it was a goal of the WVP to create a "self-sufficient village" offering a "variety of services," that people would "be able to obtain . . . within a five-minute walk." Id. Mr. Pimentel explained, "[people] wanted to be able to live in this community, shop in the community, meet their needs [in the community]." Id. at 38.
In addition to enacting the WVP, Mr. Pimentel acknowledged that Wickford itself *Page 6 
had changed since the Board's Decision in 1996. Id. at 38. Ryan's Market, the Village's grocery store, which Mr. Pimentel described as "a mainstay in Wickford for many, many years" was gone.Id. at 38, 49. Dave's Marketplace replaced Ryan's Market; however, the loss of Ryan's Market was significant because "Dave's is outside the Village proper." Id. Mr. Pimentel also noted, "we never thought that the mom-and-pop pharmacy was going to go. Rite Aid took it over. This is the reality of what is happening."Id. at 38. "These are the types of establishments that help to further[] ensure [a village's] success." Id. at 49. The exodus of these services from the village proper is what, Mr. Pimentel stated, "we were trying to protect [the residents] from."Id. at 38-39. Ensuring the "economic vitality" of the Village was specifically "incorporated into the WVP," and the needs of the Village change because, "[e]conomically, things change."Id. at 38-39, 48-50; Petitioner's Ex. 4, p. 1.
Upon cross-examination, Mr. Pimentel admitted that the area surrounding property, except for the town dock and the marinas at the end of Pleasant Street, was mainly residential in 1995 and remained so at the time of his testimony in 2009.Id. at 44-45. However, it was his opinion that granting Gardner's request would not alter the general character of the surrounding area or disturb the residential neighborhood:
 It's conditionally permitted. It's, in fact, a permitted use, albeit the board has the right to impose conditions of approval to ensure that it's in character with the surrounding neighborhood. . . . We're not deviating from the regulations. This gentleman is entitled to this[,] but he's here because there were conditions imposed then, because it was a new operation in the community. The concerns that were expressed by the residents then was that, what is going to be the ramifications of this business in the Wickford residential neighborhood? We had our 15-year test case. . . . [T]here have been no citations, no disturbances to the neighborhood. We're asking to add two *Page 7 
fryolators. . . . [I]f you approve this today, the operation from the exterior today will be no different than tomorrow. Id. at 40-41.
When asked whether the special use permit was "reasonably necessary to serve the public convenience and welfare," Mr. Pimentel directed the Board's attention to the goals and objectives that he excerpted from the WVP, which include:
 Goal No. 1 — Enhance the historic character and vitality of Wickford Village [through] [e]ncourag[ing] business to flourish through speedy permitting of improvements consistent with this plan [and] [p]reserve[ing] and maintain[ing] the working waterfront of Wickford Village to enhance the public's enjoyment of the harbor.
 Goal No. 4 — Anticipate, prepare for, and manage growth and change [through] [a]ssur[ing] the desired balance between residential and commercial activities is maintained to preserve the quality of life enjoyed by village residents and to preserve, and to the extent practicable, enhance the economic vitality of the village as a place of business.
(Petitioner's Ex. 4, p. 3) (internal quotations omitted). In Mr. Pimentel's opinion, "the minor change of this operation will help to further balance this residential and business use, and continue to make it successful." April 28, 2009 at 48-49.
Gardner's traffic expert, Paul Bannon, gave detailed testimony on the current traffic patterns in the area and the expected increase that would occur if Gardner's petition was granted.Id. at 55-59; May 26, 2009 Tr. at 20-35. It was his testimony that Gardner's proposed operation could "easily be serviced on [the existing] roadways and driveway[,]" would not "cause any kind of traffic[] harm or problem to the neighborhood or area[,]" that "[a]dequate and safe access to the property [could] be provided[,]" and the operation would "not cause undo [sic] congestion." (April 28, 2009 Tr. at 57-58.) These conclusions were based upon Mr. Bannon's review of the existing operations at the *Page 8 
property, and independent studies Mr. Bannon conducted at Gardner's Warwick store. Id. at 58-59. He also submitted an engineering report of a study he conducted at the property over a holiday weekend, detailing specific counts of vehicles observed coming and going from the property and the surrounding area. (May 26, 2009 Tr. at 20.) The report was accepted by the Board as Petitioner's Exhibit 8. Id. at 35.
On cross-examination, Mr. Bannon admitted that traffic had increased since 1996, and that the proposed use would further increase the traffic at the site; however, he did not believe this increase would be problematic. Id. at 61-65. Even taking the "worst-case scenario" of traffic numbers from the Wickford store, [10] Mr. Bannon believed the "business [could] operate safely and effectively without any undue stress or traffic hazard to the residents of the Town of North Kingstown." Id. at 33.
Gardner's ISDS expert, Mr. Hanson, testified that the "RUCK" style ISDS system that Gardner uses at the property was installed thirteen (13) years ago, when it "was an experimental system that was only approvable through the variance process," but "[u]nder today's regulations, that system is recognized as an approved alternative technology which is approved as a matter of right without the variance process being necessary."[11]
(May 12, 2009 Tr. at 11.) Based on his research, Mr. Hanson testified that the RUCK system could handle the increased use that would occur if the Board approved Gardner's petition.Id. at 10. He submitted a written memorandum of his findings to the *Page 9 
Board, which was accepted as Petitioner's Exhibit 7.Id. at 10.
There was some confusion as to the actual amount of water usage at the property. Mr. Hanson had been operating under the impression that approximately one hundred eighty (180) gallons of water drained into the RUCK system each day. Id. at 15. However, Susan Licardi, the Town's director of water supply, explained that the property had two separate water accounts and two separate drainage systems — the RUCK system and a leach field. (May 26, 2009 Tr. at 4-5.) According to her review of the records, [12] the water account serviced by the RUCK system used an average of three hundred nine and one-tenth (309.1) gallons per day, and the account serviced by the leach field used an average of two hundred twenty-five and three one-hundredths (225.03) gallons per day. Id. at 5-7. However, Mrs. Licardi acknowledged that these totals did not represent the amount of water entering the treatment systems, but only the amount of water entering the property, and that some of this water might not enter the treatment systems.Id. at 14-16.
Specifically addressing this issue, Mr. Hanson testified that based on readings from a water meter installed on Gardner's ice machine over a period of approximately sixty-two (62) days, an average of one hundred sixty-two (162) gallons per day from the RUCK account were used to generate ice. Id. at 36-37. After speaking with Gardner's owner, he estimated that around half of this amount, or eighty-one (81) gallons, would be shipped out with packaged fish, or given to lobstermen, and would not enter the RUCK system. Based upon these updated figures, Mr. Hanson concluded that the actual water *Page 10 
introduced into the RUCK system was still below the 300 gallons permitted. Id. at 36-37. He further testified that between eighty (80) and one hundred fifty (150) gallons of water per day from the leach field account were used by the exterior aquaculture facility. Taking this water usage into account, the amount of water actually introduced to the leach field system was also below the one hundred eighty-seven and two-tenths (187.2) gallons permitted.[13]Id. at 37-38. In support of his findings, Mr. Hanson submitted a design memorandum, which was accepted by the Board as Petitioner's Exhibit 9. Id. at 39.
When questioned by Chairman Pirhala about what effect the grease and oil waste from the fryolators would have on the system, Mr. Hanson testified that grease and oil waste would not be a concern because it is not introduced into the system. (May 12, 2009 Tr. at 16.) The facility currently has a 1000-gallon grease trap, and an under counter grease trap would be added on the sink, to trap grease prior to it entering the system.Id. at 16-17. This grease would be stored in a separate tank that would be serviced just like a septic tank — pumped out and emptied by a contractor. Therefore, no additional strain would be put on the system as a result of the additional grease.Id. at 16-17.
Finally, Mr. Chevalier testified concerning his current operation on the property, *Page 11 
his proposed operation, and the technology and equipment he planned to use if his petition was approved. When asked whether the high water alarm on the septic system had ever gone off, Mr. Chevalier replied that it had not. (May 26, 2009 Tr. at 66.) He also testified that "[competition in the area has dramatically changed."Id at 69. When Ryan's Market closed and Dave's Market opened, he lost thirty (30) percent of his customers — people who used to buy meat at Ryans and fish at Gardner's Wharf now go to Dave's for both. Id He said that people come in for cooked food now, but he has to turn them away. Id at 63-64.
When questioned regarding the potential smell from the fryolators, he informed the Board that he would be using "what is called a high-blast fan" system. (May 26, 2009 Tr. At 65.) This system is mounted to the top of the building and "forms a jet cone" that shoots exhaust an additional "20 to 30 feet" into the atmosphere, exhaust thereafter "will continue to rise" due to the fact that it is heated. Id This system, he explained, is "different technology" from the side-mounted ventilation systems that some people had complained about smells from.Id at 65-66. A "high-blast system" limits the instances in which the wind will blow smells into the neighborhood. Seeid He testified that the waterfront has a variety of smells, including a low tide smell, and does not believe that the smell from frying fish could be any worse than the smell of low tide.Id
With regards to the outdoor compressor on the freezer that he is seeking to install, he testified that he had spoken with the manufacturer about the noise that the new freezer would make.Id at 73. He was "assured by the manufacturer that we can meet any kind of ordinances for sound." Id The new freezer would be located behind an existing fence, so no alterations to the exterior footprint of the property will be made. Id at 77-78. *Page 12 
In addition to placing the freezer behind a fence, Mr. Chevalier testified that he would be constructing an additional buffer to further mitigate any noise produced by the freezer. Id.
In order to install the freezer, Mr. Chevalier needs relief from those conditions of the 1996 Decision that prohibit the operation of an outdoor compressor between the hours of 7:00 p.m. and 8:00 a.m. because the freezer's compressor will need to be able to switch on and off whenever necessary in order to maintain the interior temperature. Id. at 73-74. However, Mr. Chevalier testified that the freezer will likely run less during the 7:00 p.m. to 8:00 a.m. period because it will not be opened during that time, and will therefore operate more efficiently. See Id. When asked by the Board whether he'd tested these types of freezers with a decibel meter, he replied that he had — "at 20 feet [from the freezer] it [the noise level] dropped below 45 decibels."Id. at 74. He explained that he would providing even further buffering of this sound, and the nearest residence to his establishment was one hundred fifty (150) feet away.Id. at 75-76.
Numerous members of the community, including the Appellant Marianne O'Halloran, testified throughout the hearings. They were concerned about the freezer because of the noise, [14] the fryolators because of the smell[15] and potential environmental impact from the grease, [16] and the take-out service because of the traffic[17] and potential for an increase in trash.[18]
Members of the community also testified extensively about *Page 13 
their observations on the nature and character of Wickford Village[19] and the change which had occurred as a result of the economic downturn, primarily the closing of numerous businesses within the village. (April 28, 2009 Tr. at 92-93; May 12, 2009 Tr. at 57, 68-72).
 B. The Zoning Board's Decision
At the conclusion of testimony, the Board unanimously voted to approve Gardner's petition. The following oral findings of fact from the May 26, 2009 hearing indicate that the Board found both, (1) that that material change had occurred within Wickford, and (2) that, as a result of that change, the removal of the 1996 conditions was justified:
 The significant change in Wickford [of] losing Ryan's market . . . and the storefronts that are closing up, I'm hoping that you do bring a little traffic . . . enough to generate some business into the Town, so we can get it back to what it was. (May 26, 2009 Tr. at 103.).
 [T]here is a lot of change in the business climate in the Town. We've been going up and down. At this point we're down. A lot of storefronts are closed up. A lot of transitional moves by businesses in the Town. I think this village is always evolving, trying to find its place in today's economy, marketplace, and also keeping in mind the tourism aspects of it, and also the quaintness of the Town. I think we're still maintaining that with the approval of this application. Id. at 105.
Additionally, the Board found that Mr. Chevalier had "given very good testimony about the technology involved in [the] compressor for the freezer[, and the] methods to isolate the compressor."Id. at 94. The Board stated, "I believe the exterior compressor . . . *Page 14 
will be of high technology, fully isolated, sound dampening and all that technology we have today." Id. at 96. With regards to the fryolators, the Board found that the high-blast exhaust system that Mr. Chevalier testified he would be using at the property was "today's technology," stating, "I think that technology is very good." Id. at 95. Lastly, the Board found the testimony of Gardner's traffic and ISDS experts to be sufficiently supported and credible. Id. at 97.
On June 9, 2009, the Board issued its formal written Decision, granting Gardner's request for a special use permit and relief from conditions fourteen (14), fifteen (15), eighteen (18), twenty-five (25), and twenty-six (26) of the 1996 Decision. (2009 Decision, Decision at 1-10). The 2009 Decision listed 23 findings of fact. Significant amongst these were that "Wickford Village is constantly evolving," that "[t]here has been a significant negative change in Wickford since Ryan's market closed last spring of 2008[,]" that "[o]ther businesses have also closed in Wickford recently[,]" and that "[a]pproving the application would help to generate additional business in Wickford," and "serve the public convenience and welfare." Id., Findings of Fact at 13, 21, 23. In addition, the Board found that "[c]arry-out food is an approved use in Waterfront Business Zoning districts[,]" that "[t]he business is located on a peninsula, making it an isolated area[,]" and that "[t]he proposed changes to the business will not alter the surrounding village."Id. at 3, 10, 11. Finally, the Board found that the freezer and fryolator would not pose a problem due to the technology associated with those devices. Id. at 5, 9. *Page 15 
 II. STANDARD OF REVIEW
Superior Court review of zoning board decisions is governed by G.L. 1956 § 45-24-69(d). That section provides:
 The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
In reviewing questions of law, this Court conducts denovo review. Tanner v. Town Council,880 A.2d 784, 791 (R.I. 2005). In reviewing questions of fact, it is the job of the trial justice to "examine the entire record to determine whether `substantial' evidence exists to support the board's findings." DeStefano v. Zoning Board of Review ofWarwick,122 R.I. 241, 245, 405 A.2d 1167, 1170 (1979) (superseded by statute, G.L. 1956 § 45-24-41 — only as it "relate[s] to the burden of proof required to authorize the granting of a dimensional variance" — in Sciacca v. Caruso,769 A.2d 578, 583 (R.I. 2001)). This Court "lacks [the] authority to weigh the evidence, to pass upon the credibility of witnesses, or to substitute [its] findings of fact for those made at the administrative level." Restivo v. Lynch,707 A.2d 663, 665 (R.I. 1998) (quoting Lett v. Caromile,510 A.2d 958, 960 (R.I. 1986)). If this Court "can conscientiously find that the *Page 16 
board's decision was supported by substantial evidence on the whole record," it must uphold that decision. Mill RealtyAssoc. v. Crowe, 841 A.2d 668, 672 (R.I. 2004) (quotingApostolu v. Genovesi,120 R.I. 501, 509, 388 A.2d 821, 825 (1978)); seeMonroe v. Town of East Greenwich, 733 A.2d 703 (R.I. 1999). "Substantial evidence is relevant evidence that a reasonable person would accept as adequate to support the board's conclusion and amounts to `more than a scintilla but less than a preponderance."'Lischio v. Zoning Board of Review of the Town of NorthKingstown, 818 A.2d 685, 690 n. 5 (R.I. 2003) (quotingCaswell v. George Sherman Sand and Gravel Co., Inc.,424 A.2d 646, 647 (R.I. 1981)).
 III. ANALYSIS A. Administrative Finality
In Rhode Island, the authority of administrative agencies, including zoning boards, to revisit and alter prior decisions is limited by the doctrine of administrative finality. JohnstonAmbulatory Surgical Associates, LTD. v. Nolan,755 A.2d 799, 808 (R.I. 2000). Under this doctrine, an administrative agency that denies an application for relief cannot later grant a subsequent application for the same relief unless the applicant can demonstrate "a change in material circumstances during the time between the two applications." Id. The doctrine is equally applicable in cases where relief is granted subject to certain conditions — relief from those conditions cannot be granted absent a finding that there has been a subsequent change in material circumstances. See Audette v. Coletti,539 A.2d 520 (R.I. 1988). In Johnston Ambulatory, our Supreme Court stated:
 What constitutes a material change will depend on the context of the particular administrative scheme and the *Page 17 
relief sought by the applicant and should be determined with reference to the statutes, regulations, and case law that govern the specific field. The changed circumstances could be internal to the application, as when an applicant seeks the same relief but makes important changes in the application to address the concerns expressed in the denial of its earlier application. Or, external circumstances could have changed, as when an applicant for a zoning exception demonstrates that the essential nature of land use in the immediate vicinity has changed since the previous application.
Johnston Ambulatory, 755 A.2d at 811. If the administrative decision-maker chooses to grant a subsequent application for the same relief, it must "articulate in its decision the specific materially changed circumstances that warrant reversal of [its] earlier denial of the relief sought." Id.
This Court's review "is limited to a determination of whether there was sufficient competent evidence to support the findings made by the administrative agency." Id. at 812 (quotingBarrington School Committee v. Rhode Island State Labor RelationsBd., 608 A.2d 1126, 1138 (R.I. 1992)). Our Supreme Court stated,
 The determination of whether circumstances have materially or substantially changed sufficiently to warrant reversal of an earlier decision is a finding that must be made in the first instance by the administrative decision-maker and not by this Court.
 [I]f the [administrative body] has made a finding of fact that there ha[s] been a material change in circumstances and pointed to evidence to support that finding, a trial justice would likely abuse his or her discretion by independently reviewing the evidence and rejecting the [agency's] finding. Id. at 812-813.
In this case, the standards contained within § 21-15(a) of the Town of North Kingstown Zoning Ordinance, which govern the granting of a special use permit, are *Page 18 
relevant to whether there had been a material change in circumstances. Johnston Ambulatory, 755 A.2d at 811. Those provisions are as follows:
 In granting a special use permit or special permit under this chapter, the zoning board of review shall require that evidence to the satisfaction of the following standards be entered into the record of the proceedings:
 1. The requested special use permit will not alter the general character of the surrounding area or impair the intent or purpose of this chapter or the comprehensive plan upon which this chapter is based.
 2. The special use permit is reasonably necessary to serve the public convenience and welfare.
 3. The granting of a special use permit will not pose a threat to the drinking water supply.
 4. The use will not disrupt the neighborhood or the privacy of abutting landowners by excessive noise, light, glare or air pollutants.
 5. Sewage and waste disposal into the ground and the surface water drainage from the proposed use will be adequately handled on site.
 6. The traffic generated by the proposed use will not cause undue congestion or introduce a traffic hazard to the circulation pattern of the area.
 7. Accessory signs, off-street parking and loading area and outdoor lighting are designed and located in a manner which complements the character of the neighborhood. Ordinance § 21-15(a).
The doctrine of administrative finality creates an additional threshold inquiry that the Board must make before judging the remaining merits of the petition; it does not supplant the remaining requirements of the zoning ordinance — the Board must still find each requirement under the ordinance has been satisfied in order to grant the relief requested. See Marks v. Zoning Board ofReview of the City of Providence,98 R.I. 405, 406-407, 203 A.2d 761, 763 (1964) ("[A] substantial change in conditions is generally a condition precedent to the exercise of jurisdiction [by the Zoning Board]."). On the other hand, the doctrine does not require that a material change be demonstrated for every *Page 19 
single provision of the ordinance. See Gilman v. ZoningBoard of Review of the Town of West Warwick,103 R.I. 612, 240 A.2d 159 (1968) (recognizing that the Board must find "that subsequent to [an initial] denial there has been a material change in the circumstances on which that denial waspredicated.") (citing Day v. Zoning Board of Review,92 R.I. 136, 167 A.2d 136 (1961) (emphasis added); Churchill v.Zoning Board of Review, 98 R.I. 302, 201 A.2d 480 (1964);Marks, 98 R.I. 405, 203 A.3d 761; Burke v. Zoning Board ofReview, 103 R.I. 404, 238 A.2d 50 (1968)).
In its 1996 Decision, the Board imposed five conditions that the 2009 Decision removed. Conditions eighteen (18) and twenty-six (26) were that the "operation [would] not include a sit-down restaurant or take-out type service" and that "[n]o food cooked on the premises [could] be served warmed." (2009 Decision, Decision at 2-3). In support of granting relief from these conditions, the Board's 2009 Decision cited that the village had suffered a "significant negative change" since the spring of 2008 — Ryan's Market and other businesses within the village had recently closed. Id., Findings of Fact at 21. Allowing this operation to include take-out service of hot food would "help to generate additional business in Wickford." Id. This finding — that the economic downturn and exodus of businesses from the village constitutes a material change in circumstances — is a proper finding under the standards by which the occurrence of material change is determined. See JohnstonAmbulatory, 755 A.2d at 811.
In Johnston Ambulatory, our Supreme Court instructed that material change "should be determined with reference to the statutes, regulations, and case law that govern the specific field."Id. The Town's comprehensive plan is within this scheme of statutes and regulations. See G.L. 1956 §§ 45-22.2-8(c);see also Ordinance § 21-15(a)(1) *Page 20 
(requiring the Zoning Board to find "the requested special use permit will not . . . impair the intent or purpose of . . . the comprehensive plan. . . ."). Under the WVP, which is part of the North Kingstown Comprehensive Plan, it was a specific goal of the Town to
 Anticipate, prepare for, and manage growth and change [through] `[a]ssur[ing] the desired balance between residential and commercial activities is maintained to preserve the quality of life enjoyed by village residents and to preserve, and to the extent practicable, enhance the economic vitality of the village as a place of business.'
(Petitioner's Ex. 4, p. 3.) The Board made findings, both oral and written, that change had occurred, that significant business interests had left the village, and that granting Gardner's petition would help to maintain the balance of business and residential uses within the town, and "get it back to what it was." (May 26, 2009 Tr. at. 103, 2009 Decision, Findings of Fact at 21, 23). These facts and findings are sufficient to support the Board's determination that material change had occurred, thereby entitling the Board to revisit its prior Decision under the doctrine of administrative finality. See Johnston Ambulatory,755 A.2d at 811.
These findings were supported by substantial evidence on the record. See Caswell, 424 A.2d at 647 (noting substantial evidence is "more than a scintilla but less than a preponderance"). Mr. Pimentel, Gardner's planning expert, testified at length concerning the WVP and the need to maintain a "self-sufficient village" with a balance of business and residential uses necessary to provide a "variety of services" to the residents within the village proper. (April 28, 2009 Tr. at 33-39, 41, 48-49, 51). He also provided the Board with excerpts from the WVP, which were made part of the record as Petitioner's Exhibit 4. Moreover, numerous lay witnesses testified concerning the loss of *Page 21 
"mainstay" businesses from the village, (May 12, 2009 Tr. at 57, 70), the "vacant buildings,"id at 68, the numerous "for rent signs," (April 28, 2009 Tr. at 92), and the "empty storefronts."Id This Court finds that there is substantial evidence on the record to support the Board's finding that there was "a change in material circumstances during the time between the two applications," Johnston Ambulatory, 755 A.2d at 808. Finding there to be no error of law, this Court upholds the Board's decision to grant Gardner relief from conditions eighteen (18) and twenty-six (26) of the 1996 Decision. Mill Realty Assoc, 841 A.2d at 672.
Conditions fourteen (14) and fifteen (15) of the 1996 Decision were that "any stationary or mobile exterior motor or compressor be prohibited from being operated during the hours of 7:00 pm to 8:00 am," and that "[a]ll permanent compressors or motors be contained within the building." The Board made numerous findings, both oral and written, that there was adequate testimony regarding the technology of the proposed outdoor freezer and methods of noise abatement to grant relief from these conditions. (2009 Decision, Findings of Fact at 5; May 26, 2009 Tr. at 93) ("My feeling is the applicant has given very good testimony about the technology involved in this compressor for the freezer . . . he has made far and above methods to isolate the compressor."). There were also references made, throughout the hearings and within the Board's oral findings, that the freezer would be "current technology."Id at 94.
There was substantial evidence on the record to supports this finding. The Board heard testimony from Mr. Chevalier concerning the manufacturer's assurances that the technology of this freezer could "meet any kind of ordinances for sound." Id at 73. Mr. Chevalier also testified concerning the noise emitted from other refrigeration units that he *Page 22 
uses — stating that "we put some refrigeration in an enclosed area and you can hear it when you walk up on it, but you walk away and it's not even audible." Id. Board Member Gibbons asked Mr. Chevalier directly, "have you had anybody measure that [the noise emanating from a freezer like the one you propose to install] with a decibel reader meter?" Id. at 74. Mr. Chevalier responded that he had a colleague of his measure a freezer "typical to what we want to install" and the readings were "below 45 decibels" at twenty (20) feet away from the unit.Id. at 74-75. Mr. Chevalier then informed that Board that the nearest residential home to his establishment was one hundred and fifty (150) feet away. Id. at 76. Finding there to be substantial evidence on the record that any previous concerns about noise could be addressed by the fact that Mr. Chevalier was installing a freezer of "current technology" that could "meet any kind of ordinances for sound," id. at 73, 94, the Board's decision to grant Gardner relief from conditions fourteen (14) and fifteen (15) was in compliance with the doctrine of administrative finality. This Court, therefore, upholds that portion of the Board's Decision granting Gardner's petition for relief from those conditions.
 B. Need for Cooking Devices.
Finally, condition twenty-five (25) of the Board's 1996 Decision was that "[t]he operation may not have a fryolator-type frier, grill or any similar cooking device." The Board heard expert testimony from Mr. Hanson on how the grease from the proposed fryolators would be handled on the property and not emit into the surrounding environment. (May 12, 2009 Tr. at 16-17.) Additionally, Mr. Hanson informed the Board that any approval would have to be reviewed for environmental issues with DEM *Page 23 
and CRMC, and reviewed for health issues by the Department of Health. Id. at 12-14. The Board heard expert testimony from Mr. Pimentel on how adding two fryolators would not impact the surrounding area. (April 28, 2009 Tr. at 45.) Lastly, the Board heard testimony from Mr. Chevalier on how the "high-blast exhaust system" would minimize the smell that might be blown towards the nearby residences. (May 26, 2009 Tr. at 65-66.)
As an initial matter, in 1996, the Board had prohibited the property from selling hot food or offering take-out service. Therefore, a fryolator was not strictly necessary in conducting the business's operation. However, after having found there to be material changes sufficient to warrant the removal of those conditions and allow the property to provide take-out service of hot food, the situation concerning the need for a fryolator has itself been altered in a material way. See JohnstonAmbulatory, 755 A.2d at 811 (noting that a change in circumstances internal to the application, as well as external, can constitute material change under the doctrine of administrative finality). In addition to the changes brought about by the Board's removal of the above-mentioned conditions, the Board found that any environmental or odor concerns could now be addressed by the use of the updated exhaust system and through additional review by other agencies. (2009 Decision, Findings of Fact at 9, 19.)
The Board made sufficient findings, both oral and written, on these issues. Orally, the Board found the high-blast exhaust system Mr. Chevalier used to be "very good technology," which would prevent "the exhaust fumes from settling into the Town and barreling down the street towards residences." (May 26, 2009 Tr. at 95.) In its subsequent written Decision, the Board found that "[t]he use of a fry-o-lator with today's *Page 24 
technology and updated exhaust systems should not pose a problem." (2009 Decision, Findings of Fact at 9.) Additionally, the Board found that, with regards to the environmental issues, "the application must go through RIDEM, CRMC, and the Department of Health to ensure that the environmental and health standards are met by the applicant." Id. at 19. Additional review by these agencies was incorporated into the Board's Decision as a condition of Gardner's relief. Id., Decision at 10.
These findings were supported by substantial evidence on the record. Gardner's experts, Mr. Pimentel and Mr. Hanson, both testified that detailed environmental review by RIDEM, CRMC, and the Department of Health would be a prerequisite to installing the fryolator. (April 28, 2009 Tr. at 28-29; May 12, 2009 Tr. at 13-14.) Mr. Hanson, in addition, provided specific testimony regarding the grease trap system currently installed at the property, and the additional systems which Gardner would add if its petition was approved. (May 12, 2009 Tr. at 16-17.) "The grease," Mr. Hanson explained, "would not be introduced into the [ISDS] system," but would be picked up by an outside contractor. Id. at 16. Mr. Chevalier provided detailed testimony regarding the "high-blast fan" system that is installed on the property, its manner of operation, and how it would limit the potential instances in which smells would be blown towards the residential area. (May 26, 2009 Tr. at 65-66.)
This Court finds that there was substantial evidence on the record to support the Board's finding that any previous environmental or odor concerns regarding the installation of a fryolator at the property could be addressed through additional agency review and the utilization of the "today's . . . updated exhaust system." Therefore, *Page 25 
finding there to be no error of law, this Court upholds the Board's decision to grant Gardner's petition for relief from condition twenty-five (25) of the 1996 Decision.
 3. Application of Law to Changed Circumstances.
Under the doctrine of administrative finality, a prerequisite to the Board's removal of previously imposed conditions is a finding that there has been "a change in material circumstances during the time between the two applications." Johnston Ambulatory,755 A.2d at 808. This finding must be supported by substantial evidence on the record. Id. at 812. After referencing the statutes, regulations, and case law in the field, this Court finds that the Board made sufficient findings that a change in material circumstances had occurred relevant to each of the five conditions of the 1996 Decision, and that those findings were supported by substantial evidence on the record. Therefore, this Court upholds that portion of the Board's Decision granting relief from conditions fourteen (14), fifteen (15), eighteen (18), twenty-five (25), and twenty-six (26) of the 1996 Decision.
 4. The Special Use Permit
To survive judicial review, the Board's Decision must be also be supported by findings of fact that meet the applicable criteria for granting a special use permit. MayDay Realty Co. v. Board ofAppeals of the City of Pawtucket,107 R.I. 235, 239, 267 A.2d 400 (1970). This Court must determine, "whether the board members resolved the evidentiary conflicts, made the prerequisite factual determinations, and applied the proper legal principles." Id. The Board's findings of fact must be supported by substantial evidence on the record. SeeLischio supra. *Page 26 
The first requirement for granting a special use permit is that,
 The requested special use permit will not alter the general character of the surrounding area or impair the intent or purpose of this chapter or the comprehensive plan upon which this chapter is based.
Ordinance § 21-15(a)(1). As has already been discussedsupra, the Board found that "[t]he business is located on a peninsula, making it an isolated area[,]" "[t]here are no external changes proposed for the building[,]" and "[t]he proposed changes to the business will not alter the surrounding village." (2009 Decision, Findings of Fact at 10, 11, 17.) These findings were supported by the only expert testimony offered on this issue, the testimony of Gardner's planning expert, Mr. Pimentel. As has been discussed in detail above, Mr. Pimentel testified at length concerning the WVP's desire to support a self-sufficient village with a variety of services, and how the "minor change of this operation will help to further balance [the] residential and business use." (April 28, 2009 Tr. at 48-49). While Mr. Pimentel did admit that the area surrounding the property, except for the town dock and the marinas at the end of Pleasant Street, was mainly residential, it was his opinion that the minor change would not alter the character of the surrounding area: "if you approve this today, the operation from the exterior today will be no different than tomorrow." (April 28, 2009 Tr. at 41.) In addition to Mr. Pimentel's testimony, the Board heard numerous lay witnesses testify concerning the nature of the surrounding area. While some residents testified that the area was mainly residential, others testified that it was a "working village" with the sounds of boat engines being started, and fishermen going to work at 4:00 a.m.Id. at 84-85
It is not the role of this Court to "weigh the evidence, to pass on the credibility of witnesses, or to substitute [its] findings of fact for those made at the administrative level", *Page 27 Restivo, 707 A.2d 665, but to determine whether the "board's decision was supported by substantial evidence on the record."Mill Realty, 841 A.2d 672. Based upon Mr. Pimentel's testimony and the excerpts from the WVP, incorporated into the record as Petitioner's Exhibit 4, this Court finds there to be substantial evidence on the record to support the Board's findings that granting this proposal would not "alter the general character of the surrounding area or impair the intent or purpose of the [zoning ordinance] or the comprehensive plan." Ordinance § 21-15(a)(1).
The second requirement for granting a special use permit is that the "permit is reasonably necessary to serve the public convenience and welfare." Ordinance § 21-15(a)(2). In its Decision, the Board specifically found this condition was satisfied. (2009 Decision, Findings of Fact at 13.) Substantial evidence to support this finding is strewn throughout the record. Mr. Pimental, and several members of the community testified that the closing of several businesses within the village proper had resulted in a loss of services. (April 28, 2009 Tr. at 38-39, 49.) This Court therefore finds there to be substantial evidence on the record to support the Board's finding that the special use permit was "reasonable necessary to serve the public convenience and welfare."
The third and fifth requirements for granting a special use permit are that "[t]he granting of a special use permit will not pose a threat to the drinking water supply," and "[s]ewage and waste disposal into the ground and the surface water drainage from the proposed use will be adequately handled on site." Ordinance §§ 21-15(a)(3), (5). In its Decision, the Board found that "[b]ased upon the testimony of applicants [sic] engineer[,]" these requirements were met. (2009 Decision, Findings of Fact at 14, 20.)
As discussed in detail supra, Gardner's ISDS expert, Mr. Hanson, and Susan *Page 28 
Licardi, the Town's director of water supply, testified concerning water usage and the ISDS systems at the property. While Mr. Hanson's original testimony — that the existing ISDS system could handle the additional water usage that adding a take-out service would create — was called into question by the water usage averages testified to by Mrs. Licardi, Mr. Hanson was able to account for the discrepancy and reaffirm his conclusion that the current ISDS system would be adequate to handle the additional use. (May 12, 2009 Tr. at 15-16; May 26, 2009 Tr. at 5-7, 36-38.) Mr. Hanson's testimony, concerning the water used to generate ice and service the aquaculture facility behind the property, was corroborated by a lobsterman who testified that he takes 150-200 pounds of ice daily from the property, and an oyster farmer who testified that he uses a substantial amount of the water in his oyster facility behind the property. (May 12, 2009 Tr. at 44; May 26, 2009 Tr. at 56-57.)
While there might be some conflict between the testimony of Mr. Hanson and Mrs. Licardi, it is the responsibility of the Zoning Board to weigh the evidence and the credibility of witnesses.Restivo, 707 A.2d 663; § 45-24-69(d). Having weighed the evidence and found that §§ 21-15(a)(3) and (a)(5) of the Ordinance were satisfied, the Board made its findings. Those findings were supported by substantial evidence on the record, and therefore, this Court upholds them. Mill Realty, 841 A.2d at 672.
The fourth requirement for granting a special use permit is that "[t]he use will not disrupt the neighborhood or the privacy of abutting landowners by excessive noise, light, glare or air pollutants." Ordinance § 21-15(a)(4). The issues of noise and air pollutants have already been addressed herein. On the remaining issues of light and glare, the Board found that these conditions were satisfied. (2009 Decision, Findings of Fact at 15). *Page 29 
These findings were supported by the evidence in the record, because the proposal did not seek to alter the exterior footprint or lighting scheme in any way. (May 26, 2009 Tr. at 77; 2009 Decision, Findings of Fact at 17.) They are therefore upheld.
The last requirement for granting a special use permit is that "[t]he traffic generated by the proposed use will not cause undue congestion or introduce a traffic hazard to the circulation pattern of the area." Ordinance § 21-15(a)(6). In its Decision the Board found, "[t]raffic will increase in the area due to the expanded take-out food service, but it will not be a detriment to the area." (2009 Decision, Findings of Fact at 16.) The only expert testimony evidence presented at the hearings on issue of traffic was presented by Gardner's traffic expert, Mr. Bannon, [20] who testified that "taking into consideration both the existing and projected traffic, . . . [the proposal] would not have a detrimental effect on traffic in the area." (May 26, 2009 Tr. at 33.) As has been established supra, his testimony was based upon a review of the operation and traffic counts conducted at the property, as well as Gardner's Warwick store. The results of his studies were introduced into the record as Petitioner's Exhibit 8. This was the uncontradicted expert testimony on this issue. It constitutes substantial evidence to support the Board's finding that § 21-15(a)(6) of the Ordinance was met, and this Court therefore upholds that finding. *Page 30 
 IV. CONCLUSION
This Court finds that the Board's Decision, granting Appellee's petition for a special use permit and relief from five of the thirty-three (33) conditions contained within the 1996 Decision, was in conformity with the doctrine of administrative finality, was not affected by error of law, and was supported by substantial evidence on the record. Substantial rights of the Appellants have not been prejudiced. Therefore, the Decision of the Board is affirmed in its entirety.
Counsel for Gardners Wharf Holding, LLC shall submit an appropriate judgment for entry, within ten (10) days of this Decision.
[1] North Kingstown Zoning Ordinance § 21-15(b) permits the issuance of a special use permit in conjunction with a dimensional variance.
[2] The purpose of the 1995 Consent Agreement was to allow Gardner's predecessor to install an ISDS on the property. The conditions within that agreement were arrived at through discussions and negotiations between the applicant, RIDEM, and the town residents. Many of the residents, including the Appellants, take particular issue with the Board's 2009 Decision because it granted relief from conditions of an agreement that the residents actively participated in crafting. See April 28, 2009 Tr. North Kingstown Zoning Board Hearing at 74-75. Although the residents assisted negotiating some of the conditions of the agreement, neither the Town, nor any of the residents, were parties to or signatories of the Agreement. The Agreement was entered into solely between RIDEM and Gardner's predecessor in interest.
[3] North Kingstown Zoning Board hearing transcripts are hereinafter cited according to the following form: "hearing date" Tr. at "page".
[4] Although Mr. Reilly did not explicitly state on the record that he was explaining the "doctrine of administrative finality," the effect of his remarks was to detail the relevant inquiry the Board was to make in accordance with the principles of that doctrine.
[5] Mr. Pimentel's resume was introduced as Petitioner's Exhibit 3.
[6] Mr. Bannon's resume was introduced as Petitioner's Exhibit 5.
[7] Independent Sewage Disposal System is hereinafter referred to as "ISDS."
[8] Mr. Hanson's resume was introduced as Petitioner's Exhibit 6.
[9] Mr. Pimentel also testified that the WVP was recently reaffirmed in 2008, as a part of the North Kingstown Comprehensive Plan's five-year update. (April 28, 2009 Tr. at 33.)
[10] Gardner's Warwick store offers similar services to what Gardner is proposing to add to its Wickford store. It was, therefore, used as a comparison. However, because the Warwick store is located on a much busier thoroughfare than the Wickford store is, Gardner's expert believed that traffic numbers at the Warwick store would represent a "worst-case scenario" of the type of traffic the Wickford store might generate. May 26, 2009 Tr. at 19, 33.
[11] It was noted, however, that commercial RUCK systems still require special review. (May 26, 2009 Tr. at 9.)
[12] Mrs. Licardi's daily averages were arrived at by reviewing the water usage on each of the property's accounts over a period of approximately seven to eight (7-8) years. (May 26, 2009 Tr. at 5, 7.)
[13] Mr. Hanson's testimony concerning the water that was used to make ice and service the exterior aquaculture facility was corroborated by the testimony of several lay witnesses. A lobsterman who uses ice from Gardner's Wharf testified that he takes 150 to 200 lbs of ice from the facility each day. (May 12, 2009 Tr. at 44.) Peter Chevalier, the owner of Gardner's Wharf, also testified that he uses "far more than 50 percent [of his ice] outside the store." (May 26, 2009 Tr. at 67.) Additionally, an oyster farmer who operates the oyster farm behind Gardner's Wharf, testified that he uses a substantial amount of water from Gardner's account to service his oyster farm. He stated, "I was surprised at how much water I really use. I didn't think I was using that much water. . . . [Y]ou use up a hundred gallons easily. I do this year-round." (May 26, 2009 Tr. at 56-57.)
[14] April 28, 2009 Tr. at 70-71, 79.
[15] April 28, 2009 Tr. at 69; May 12, 2009 Tr. at 54.
[16] May 12, 2009 Tr. at 35-36.
[17] April 28, 2009 Tr. at 67.
[18] May 12, 2009 Tr. at 60; May 26, 2009 Tr. at 60-62.
[19] April 28, 2009 Tr. at 84; May 12, 2009 Tr. at 42, 51.
[20] While the Appellant and other members of the community expressed concern over the potential increase in traffic, our high court has determined that such testimony has "no probative force".Salve Regina College v. Zoning Board of Review of City ofNewport, 594 A.2d 878, 882 (R.I. 1991).

 *Page 1